F. H. AYERS v. A. J. HARRIS ET AL.

No. 6271.

1. **Maximo Moreno Grant.** — See another discussion of the facts showing its north boundary line.

2. **Archives in Land Office—Field Book of Surveyor.** — The memorandum made by a colonial surveyor in 1833 at the time he made a survey, and deposited in the Land Office with the title itself, and there preserved, may be regarded as an archive. Cook v. Deems, 61 Texas, 248.

3. **Same—Declarations of Surveyor.**—The memorandum having been identified as made by the surveyor, who died before the trial, it was competent to aid in proving the actual footsteps of the surveyor when making the survey.

4. **Declarations of Deceased Surveyor.**—Such declarations as to locality of a survey made by the surveyor who made it are admissible after his death. They could not rank higher than his written version of the matter made at the time.

5. **Photographic Copies.**—Such copies of an archive showing the original English field notes made by the surveyor upon the ground are competent when it is in issue whether the survey had been actually made of all the lines called for.

6. **Charges.**—See charges given and refused upon the dignity of calls in the Moreno title, and upon the mode of identifying the survey, approved.

7. **Production of Testimony—Practice—Rebuttal.**—Where the plaintiff proves a fact by one or more witnesses, and the defendant does not contradict such evidence, the plaintiff on objection will not be allowed to strengthen his testimony upon such fact; otherwise, if the defense had attacked the testimony.

APPEAL from Bell. Tried below before Hon. W. A. Blackburn. The opinion states the case.

*C. L. Cleveland,* for appellant.— 1. The field notes which were embodied in the original title and formed part thereof are those which are to control in respect to the identification of the land surveyed for Maximo Moreno by the original surveyor, to the exclusion of any survey or supposed survey made by Samuel Sawyer, there being no evidence showing or tending to show the connection or relation of Samuel Sawyer to the survey for Maximo Moreno and the title extended thereon to him. Laws of Coahuila and Texas; Instructions to Commissioners (Kimbal), p. 71, arts. 7, 8, 10; Id., Decree 128, p. 146, art. 4; Norris v. Monen, 3 Watts, 4.

2. The field book of original surveyor of a survey made under the laws of Mexico in force in 1833 is not admissible as original evidence, even if identified, it being a mere private memorandum of the surveyor, serving to guide him in making his original and official report of survey, which under the law then existing was incorporated in the original title as the primitive and authentic evidence of the fact and mode of survey by him made in the field and on the ground, and descriptive of the land intended to be embraced. Such private memorandum field book does not become an archive by the mere fact that it is deposited in the General Land Office. Its quality is to be determined by law. The field notes

officially signed and reported by the surveyor, and which were required to be incorporated in the original title, is in law the archive, to the exclusion of the unofficial memorandum or field book, which contains only the data from which the surveyor compiles and certifies the official field notes of the survey of the land embraced, and as intended to be described by him and reported to the proper officer, who received the same in order that it should be incorporated in the original title. Herndon v. Cassiano, 7 Texas, 333; Paschal v. Perez, Id., 348; Dallam's Decisions, Smith v. Townsend, 570; Hatchett v. Conner, 30 Texas, 110; 2 White's New Recopilacion, 514, 600.

3. If the testimony was not sufficient to identify the two hackberries called for in the grant, then, in accordance with the rule that course controls distance and that course and distance control quantity, the northern line of the Moreno grant (which was the one in dispute) would be fixed by the course and distances of the first and second lines of the survey of the Moreno grant run from the beginning corner, which was not disputed, except that the second line of the survey should be extended so as to meet the east line, the position of which was known. If the northeast corner was not determined by the hackberries, there was nothing to interfere with the location of the Moreno grant in exact accordance with the field notes, except the one thing of extending the second line far enough to meet the conceded location of the eastern boundary. It did not depend on anything requiring the exercise of judgment on the part of the jury; it was a matter of course. The position of the east line being known, it controlled the survey in respect to that line which, if the two hackberries were not identified as the ones called for, required the second line to be extended sufficiently far to reach it on its acknowledged course as run and extended to points of intersection with the back line from the lower river corner, which was found and identified. In other words, the course and distance of the first line and the course of the second line of the survey must govern if the evidence was not sufficient to fix the location of the northern line by identifying the two hackberries with those called for in the field notes for the northeast corner of the survey, or by some other marks or monuments. Ayers v. Watson, 113 U. S.; Tyler on Bound., 282; Ayers v. Harris, 64 Texas, 296; Ayers v. Lancaster, 64 Texas, 305; Stafford v. King, 30 Texas, 273; Welder v. Hunt, 34 Texas, 44; Buford v. Gray, 51 Texas, 331.

4. The court erred in excluding evidence offered by the plaintiff to show that there were trees marked with old blazes on the east line of the Maximo Moreno survey, above and beyond the point claimed by the defendants as the northeast corner of the grant, and that said blazed and marked line extended on its course to the point as claimed by the plaintiff as the northeast corner of said Moreno grant. Markham v. Carothers, 47 Texas, 27; Clay v. Ferris, 10 Vt., 112.

5.   The court erred in its general charge to the jury to the effect that where all, or indeed if any, of the lines have been actually run and measured on the ground, then in order to elucidate the calls of a survey, in seeking to trace it on the ground, the corner called for in the grant as the beginning corner does not control more than any other corner actually and equally ascertained; nor are you under such a state of facts compelled to follow the calls of the grant in the order said calls stand in the field notes, but you are permitted to reverse the calls and trace the lines the other way, and you should do so whenever by so doing the land embraced would most nearly harmonize all the calls and objects of the grant, always bearing in mind that whether following the calls of the grant in the order in which they stand in the field notes or reversing the lines, that you must follow the lines made by the footprints of the original surveyor, because it is a matter of no consequence which corner of the line or survey was first made, but the real question is, did the surveyor mark the boundaries or corners defining the land to be conveyed, etc.   Ayers v. Lancaster, 64 Texas, 305; George v. Thomas, 16 Texas, 85; Bolton v. Lane, 16 Texas, 96; Bass v. Mitchell, 22 Texas, 285; Buford v. Gray, 51 Texas, 331; Booth v. Strippleman, 26 Texas, 436; Anderson v. Stamps, 19 Texas, 465; Tyler on Bound., 201–208, 285–303; Ring v. King, 4 Dev. & Batt., 164.

6.   The giving of one call superiority over another is for the purpose of identifying the actual survey made by the surveyor, the rule being that the footsteps of the surveyor must be followed, and wherever the surveyor established the lines and corners on the ground, there the survey must be located.   The beginning corner was identified and admitted, and its location and position was as well ascertained as was the lower corner, both being on the San Andres River.   The evidence of Johnson, the surveyor, and Duty, his chainman, was that the survey was made on the ground from the beginning (southwest) corner, and thence in the order of the calls as set forth in the grant, to the lower corner on the river.

A posterior line will never be reversed for the purpose of showing the termination of a prior line, unless the description of the posterior be more specific than that of the prior, and unless from the posterior a mistake in the prior can be clearly shown; especially is this true where, by reason of the termination of the lines on a stream which forms a base or connecting line between the lines aforesaid, the area, by such reversal, as in this case, might be arbitrarily diminished and the configuration changed.   The charge, in the light of the admitted facts and the evidence of the original surveyor who made the survey as to the mode of making it, was improper, misleading, inapplicable, and violative of the paramount rule that the footsteps of the surveyor must be followed in ascertaining the location of the grant on the ground.   The charge complained of is allowable only where the purpose of the reversal of the calls is to ascertain

his footsteps (these being unknown), or where such reversal will guide more certainly to a lost corner or line than by following the calls in their order as they appear in the field notes. The court erred in allowing reversal, if any of the lines were measured. Ayers v. Lancaster, 64 Texas, 305; Harry v. Graham, 1 Dev. & Batt., 76; Ring v. King, 4 Dev. & Batt., 164; Johnson v. McMillan, 1 Strob., 143; Tyler on Bound., 338, 201, 208.

*Goodrich & Clarkson* and *A. J. Harris,* for appellees. — 1. Admission of Johnson's field book, photographs, etc. Cook v. Dennis, 61 Texas, 248.

2. The court did not err in admitting in evidence the deposition of F. W. Johnson, taken in 1860, in case of David Ayers v. Thomas Lancaster. Stroud v. Springfield, 28 Texas, 649; George v. Thomas, 16 Texas, 92; De Leon v. White, 9 Texas, 607; Welder v. Hunt, 34 Texas, 37; Speer v. Coot, 3 McCord, 229; Morton v. Folger, 15 Cal., 277; Cornwall v. Culver, 16 Cal., 424; Ferris v. Coover, 10 Cal., 629.

3. The court did not err in charging the jury, nor in refusing to give charge asked by appellant. Phillips v. Ayers, 45 Texas, 601; Ayers v. Harris, 64 Texas, 296; Ayers v. Watson, 113 U. S.; Stafford v. King, 30 Texas, 273.

4. The east line of the survey being marked and measured and streams noted thereon, should not be made to yield to course and distance on the other unmarked lines, and the general position of the northeast corner having been proved by Johnson and Duty in Elm Creek bottom, and the evidence showing conclusively that the bottom did not extend more than three-quarters of a mile above the hackberry corner on the course of the east line, even if the exact position of the northeast corner was not proved to the satisfaction of the jury so as to enable them definitely to fix the position of the north line from said corner, still the east line should under all the evidence control the position of the north line, and not be controlled by the length of the west line as given in the field notes. Phillips v. Ayers, 45 Texas, 601; Ayers v. Harris, 64 Texas, 296; Booth v. Upshur, 26 Texas, 64; Booth v. Strippleman, 26 Texas, 436.

5. The court did not err in refusing to allow appellant to reopen his case after appellees had closed their testimony and introduce original evidence necessary to support and make out his cause as alleged in his pleadings, and not in rebuttal to any testimony introduced by appellees. Rev. Stats., arts. 1297–1299 (this statute enacted since decision of Markham v. Carothers, 47 Texas, 21).

HENRY, ASSOCIATE JUSTICE.—This suit was brought by the appellant to recover of the defendants the land described in his petition, originally granted by the Mexican Government to Maximo Moreno as eleven leagues, situated in Bell County, of which appellant alleges he is the

owner.   The appellees claimed title in hostility to the boundaries of the Moreno grant as alleged by the appellant, and in addition to their pleas of not guilty they set forth specifically the several tracts by them claimed respectively, by virtue of locations, surveys, and patents junior to the Moreno grant, and asked affirmative relief respectively.   Before the trial of the cause in the court below an agreement was made by the appellant and appellees which eliminated from the controversy all questions regarding the validity of the title or titles relied upon on both sides, and it was stipulated that the appellant had a complete chain of transfer to the Moreno grant, and that the several appellees had title to the several tracts of land claimed by them respectively, and it was agreed by the parties that the question between the plaintiff (appellant) and the defendants (appellees) was as to the position and locality of the north boundary line of the Moreno grant.

Upon the verdict of a jury judgment was rendered for the defendants.

The description of the land in the title is as follows:   "The land surveyed by me for the citizen Maximo Moreno is situated on the left margin of the river San Andres below the point where the creek called Lampasas enters said river on its opposite margin, and it has the lines, limits, boundaries, and landmarks as follows, to-wit:   Beginning the survey at a pecan fronting the mouth of said creek, which pecan served as a landmark for the first corner, and from which 14 varas to the north 59 west there is a hackberry twenty-four inches in diameter, and 15 varas to the south 34 west there is an elm twelve inches in diameter, a line was run to the north 22 east 22,960 varas, planted a stake in the prairie for the second (northwest) corner; thence another line was run to the south 70 east, at 8000 varas crossed a branch of the creek called Cow Creek, at 10,600 varas crossed the principal branch of said creek, at 12,580 varas two small hackberries serve as landmarks for the third (northeast) corner; thence another line was run to the south 20 west, at 3520 varas crossed the said Cow Creek, at 26,400 varas to a tree on the aforesaid margin of the river San Andres, which tree is called box-elder, from which 7 varas to the south 28 west there is a cottonwood with two trunks, and 16 varas to the south 11 east there is an elm fifteen inches in diameter; thence following the river up by its meanders to the beginning, and comprising a plain area of 11 leagues of land or 275,000,000 square varas."

The order for the survey of the Maximo Moreno grant was made at San Felipe de Austin on the 28th day of September, 1833. It was directed to F. W. Johnson as surveyor.

The date of the survey does not appear in Johnson's report of the survey.   The title was issued at San Felipe de Austin on the 8th day of October, 1833.

The deposition of F. W. Johnson was taken and read by plaintiff. He testified that he made the survey in 1833, but did not state at what period

of the year he made it; that he was never on the land subsequent to the date of his survey, except when he was traveling through the county; and that he kept a field book of the lines he ran for the Moreno survey and noted in it the creeks crossed and other prominent objects, and that it was then in the General Land Office at Austin.

William Duty testified that he assisted Johnson in making the survey, and that it was made in April, 1833.

W. C. Walsh, Commissioner, testified that "there is in the archives of the General Land Office a book known as 'Book C' of original English field notes of surveys made in the States of Coahuila and Texas, among which are the surveys of large tracts on the San Andres or Little River. This book is also known as Johnson's field book. I know it from official tradition.

"The original field notes of the survey of Maximo Moreno's eleven league tract exist in the archives of the General Land Office, and are under my custody.

"They are contained in Book C above described, but I have had no opportunity of identifying them as Johnson's work.

"I do not personally know when the field notes known as Johnson's work and contained in Book C were deposited in the General Land Office, nor is there any official statement establishing the date of that deposit, but I understand that the deposit was made at the same time as that of the titles issued by the alcalde of San Felipe de Austin—that is, at the opening of the General Land Office.

"They were bound in book form in 1846. The original field notes of the Maximo Moreno tract are hereto attached, marked Exhibit A.

"A photographic copy of pages 172 and 173 of Book C is hereto attached.

"I believe that the words north 22 east 22,960, found in the first call, were written by the same hand that wrote the body of the field notes. They cover a blank left vacant when the body of the field notes was written, and appear to have been written with a finer pen than that used for writing the body of the field notes."

X. B. De Bray, clerk and translator of the General Land Office, gave substantially the same testimony as that of the witness Walsh, and also stated that he knew F. W. Johnson, and had heard him designate Book C as his official field book, and say that the field notes contained in it were in his own handwriting. This witness also testified that the original English field notes of the Maximo Moreno eleven league tract were in his custody, under the Commissioner, contained in Book C, and referred to Exhibit A and the photographic copies of them attached to the deposition of Walsh as correct.

Exhibit A, attached to the depositions, reads as follows:

"Sunday, 21st April, 1832.—Surveyed for Samuel Sawyer 11 leagues

of land on the north side of San Andres opposite the mouth of Lampasas.

"Sunday, 21st April, 1833.—At a pecan 18 inches diameter bearing north 59 west 14.3 varas from a hackberry 24 inches, and south 34 west 152 varas from an elm 12 inches; thence north 22 east 22,960 varas to the corner a stake in the prairie; thence south 70 east 1690 varas to a branch of Cow Creek, 4500 varas to second branch, 8000 varas to third branch, 11,000 varas to Cow Creek, 12,580 varas to the corner two small hackberries; thence south 20 west 3520 varas to Cow Creek, 7500 northwest corner of second tract a stake bearing north 77 east 93.3 varas from a hackberry 8 inches to Spring Branch 23,640 varas, 23,700 to bottom prairie, 24,360 crossed same branch to the corner a box-elder, 2640 varas bearing south 48 west 7.2 varas from a forked cottonwood 48 inches, and south 11 east 16.4 varas from an elm 15 inches."

A photographic copy of the same instrument was attached as an exhibit to the depositions.

The first assignment of error is as follows: "The court erred in permitting to be read in evidence by defendants the photographic copy of field notes made for Samuel Sawyer."

The second error assigned is: "The court erred in permitting to be read in evidence, over the objections of the plaintiff, the documents (purporting) to be a certified copy of field notes from Book C of an eleven league survey made for Samuel Sawyer."

The eighth error assigned is as follows: "The court erred in refusing to give charge No. 4, as asked for by the plaintiff," reading as follows: "The jury are charged that the field notes which entered into and form part of the title originally made to Maximo Moreno by the Mexican Government in 1833 are those which are to control them in their findings in respect to the work of the original surveyor in the field. That they will not consider any field notes of a survey purporting to have been made for one Sawyer, unless the evidence should show that the field notes last mentioned entered into and were incorporated in the grant made and issued to Moreno on the application of his attorney, T. J. Harrel. And unless the proof shows that the Sawyer field notes formed part of the title issued to Moreno in evidence, then they will disregard them and look only to the field notes contained in the grant issued to Moreno upon the application of his attorney, T. J. Harrel."

The evidence, we think, places it beyond doubt that the survey mentioned in the field book as made for Samuel Sawyer was a survey of the same land that was titled to Maximo Moreno, and the only survey that was ever made of it. It can not be doubted, upon this evidence, that Johnson having made the survey for Sawyer a few months before, adopted it when ordered to make a survey for Moreno without making a resurvey.

The memorandum made by him at the time of the survey and deposited

.in the General Land Office at the same time that the title itself was de-
posited there, and carefully preserved ever since, is spoken of by its cus-
todians and produced as an archive. In the case of Cook v. Dennis, 61
'Texas, 248, a similar document was spoken of by this court as an archive
and held to be admissible in evidence.

Even if it can not strictly be held an archive of the General Land
·Office and admissible as such, it was clearly proved in this case to be a
memorandum of the survey made by the surveyor at the time the work
was done, and as such we think it was clearly admissible to aid in prov-
ing the actual footsteps of the surveyor when making the survey.

Very great difficulty existed in ascertaining where the lines of the sur-
·vey were actually run. Aided by all the evidence that could be secured,
·and guided by all the rules recognized as being proper to be observed in
such cases, repeated trials of the question have been had with conflicting
results.

It is a well recognized rule that the declarations of the surveyor may
be proved under the circumstances existing at the time of the trial of
this cause. · Such evidence can certainly rank no higher and can not be
so safe or satisfactory as evidence written down by the surveyor at the
time. The only difference that we can see between the field notes taken
from the field book and those contained in the title is with regard to the
number and distances of some of the objects called for, and we think the
notes contained in the field book could not have had any other tendency
than to aid in showing where the north line of the Moreno survey was
actually placed by the surveyor.

The photographic copy was admissible for what it was worth on the
·question as to whether the west line of the survey was actually measured.

The charge requested and refused would have tended to destroy the
·effect of the evidence.

We conclude that the court did not err either in admitting the evidence
·or in refusing the charge.

The surveyor, F. W. Johnson, testified in his deposition that the north
and west lines of the survey were actually measured. On cross-examin-
ation he testified as follows:

"I testified by deposition in the case of David Ayers v. Thomas Lan-
caster, then pending in the District Court of Bell County, as to the order
in which the Maximo Moreno survey was originally run by me in making
said survey, and I then testified in said cause that I commenced the sur-
vey at the southeast or lower river corner and first ran the·east boundary
line northwardly from this southeast corner, and measured and marked
it and established the northeast corner, and that I next ran the northern
boundary line westwardly from the northeast corner, and that the western
boundary line was then run southwardly, if run at all, from the north-
·west corner to the river, but that I was under the impression that the

north boundary line was never run but left open; but I then testified under a misapprehension."

Subsequently the defendants, over the objection of plaintiff, read in evidence the deposition of Johnson taken in the case of Ayers v. Lancaster, and which was as follows:

"I know the survey on the San Andres, the southwest corner of which is called for in the field notes opposite the Lampasas, or Three Forks, as they were then called. The grant, as I understood, was made to Maximo Moreno.

"I made the survey in the year 1833, under the authority of Williams and Austin, empresarios.

"The survey was made from the southeast corner and thence northerly; the second or north line was run westwardly; the third, if run at all, was run southerly to the river, and thence with the meanderings of the river to the beginning. I am of the opinion that the upper line was not run and measured, but left open. Two of the lines, viz., the first and second, were measured, marked, and corners established.

"I know not what change was made by the translator of the field notes; the survey was made as above stated, viz., beginning on the margin of the river at the southeast corner. The beginning or southeast corner, as well as the northeast corner, was marked by bearing trees—what kind of trees I do not recollect. The northwest corner may be marked by a bearing tree or trees, or only stake. I do not recollect whether it is in the prairie or timber; if in timber there are bearing trees. The end or north boundary line was run from the northeast corner.

"The north boundary line is at right angles with the first line of the survey. Why the upper line was not run at the same degree as the lower I can not at this time tell, unless it was left open and subsequently found that it would cross the Leon."

The court permitted the deposition to be read on the ground that it was the declaration of a deceased surveyor. If it be conceded that under the circumstances of this case the evidence was inadmissible, yet owing to the fact that the witness had stated in another deposition all of the material facts contained in the deposition objected to, we think it must be held that no prejudice could have resulted to the plaintiff, and the error should be treated as immaterial.

The court instructed the jury that the boundaries of the grant "must be ascertained and fixed upon the ground by the description of said boundaries as contained in the title." And also that "it was the duty of the jury in ascertaining the land surveyed to follow the tracks of the surveyor if possible to do so by any marks left by him or called for in the grant and identified by the proof, and if these tracks can not be found, then you should follow the course and distance called for in the field notes."

The court also gave to the jury full instructions as to the relative value

of different calls in grants, and gave the following charges, which are objected to by appellant:

"You are further instructed that if the evidence does not satisfy your minds that the two hackberries said to have been found are the ones called for and marked as corner by the original surveyor as the northeast corner of the Moreno grant, then you will from the whole proof, under the rules of law given you in a former part of this charge, so fix the unmarked or disputed lines called for in the grant, if you should find that there are such unmarked lines, as in your judgment, under the rules of law given you in this charge, most nearly harmonize the calls with the known corners and marked lines; and if from the evidence you fix these lines so that the land claimed by the defendants is within the boundaries of the Moreno grant, then you will find for the plaintiff; otherwise you will find for the defendants.

"In order to elucidate the calls of a survey, in seeking to trace it on the ground, the corner called for in the grant as the beginning corner does not control more than any other corner actually and equally ascertained, nor are you under such a state of facts compelled to follow the calls of the grant in the order said calls stand in the field notes, but you are permitted to reverse the calls and trace the lines the other way; and you should do so whenever by so doing the land embraced would most nearly harmonize all the calls and objects of the grant, always bearing in mind that whether following the calls of the grant in the order in which they stand in the field notes or reversing the lines, that you must follow the lines made by the footprints of the original surveyor, because it is a matter of no consequence which corner of the line or survey was first made, but the real question is, did the surveyor mark the boundaries or corners defining the land to be conveyed."

It is insisted that in lieu of said charges the court should have given the following, which were requested by plaintiff but refused by the court: "If the testimony does not satisfy you that the two hackberries (said to have been found by Bigham in 1853) have been identified as the same which were marked by the original surveyor for the northeast corner of the Moreno survey, then if you believe from the evidence that the western and the northern lines or back lines were run according to the field notes, you will find for the plaintiff."

"If the testimony is not sufficient to identify the two hackberries mentioned in the testimony as the same as called for in the grant as the true northeast corner as fixed and established on the ground by the original surveyor, Johnson, in 1833, and if the jury can not fix the northeast corner nor the back line by any other marks or monuments, then they will fix it by the courses and distances of the first and second lines of the survey, except that the second line should be extended so as to meet the recognized east line as marked and extended beyond the two hackberries,

if the evidence should show that the eastern line was originally marked above and beyond the said hackberries."

We can see no objection to the charges given by the court, and in so far as the charges requested and refused contained correct propositions we think their substance had been sufficiently given, and that giving them would have tended to confuse rather than enlighten or aid the jury.

The rules of law applicable to boundaries generally and to this grant in particular have been expounded not less than five times by this court and once by the Supreme Court of the United States, and have been correspondingly charged in the trial courts.

The evidence of the same witness, as well as of different witnesses, has been found contradictory, and the true positions of the boundaries of the grant, with all the light that can be cast upon them by the law or the evidence, remain obscure.

The facts were such that the law did not permit the result to be controlled by a charge of the court. Beyond giving the jury to intelligently understand that it was their duty to ascertain the boundaries by following the footsteps of the surveyor, we think the results of the trials tend to demonstrate that the jury could not be materially aided by the charge of the court. That much and more was correctly done in this case, and we think the charges asked were correctly refused.

Appellant objects to the following charge given by the court: "If from the proof before you and the instructions herein given you can fix the lines of this survey in harmony with its calls and the known corners, then the fact, if you find such to be the fact, that said lines would include more than eleven leagues becomes immaterial, and you will in such case not consider the extent of the area further than as a circumstance to aid you, in connection with all the evidence in the case, in following the footsteps of the original surveyor and fixing the true boundaries of said grant."

This charge is identically the same as a charge given upon a trial of this same controversy between other parties, and held by this court to be prejudicial to the party occupying the position now held by appellees. See the case of Scott v. Pettigrew, 72 Texas, 328. The opinion in that case contains this language: "We think the jury should not be instructed to fix the unmarked and undefined boundaries regardless of the fact of excess."

In this case the lines of the survey as claimed by plaintiff, and even as they are left by the judgment, include a much greater area than the eleven leagues intended to be granted. The charge that the existence of such excess was "immaterial" and not to be considered further than as a "circumstance" to aid, in connection with all the evidence in the case, in following the footsteps of the original surveyor was not prejudicial to appellant. The charge is we think somewhat obscure, if not contradictory.

We think, however, that the jury, when taking it by itself or in connection with other charges given them, could not have failed to understand it to mean that if the boundaries of the survey could be ascertained, then its including more than eleven leagues would be immaterial and not to be considered, and that the only use that they could make of the area would be as a circumstance to aid them in finding the true boundaries, and not as evidence authorizing them to vary from or disregard the boundaries as shown by other proper evidence.

The remaining assignments of error and statements to support them are as follows:

"The court erred in excluding evidence offered by the plaintiff to show that there were trees marked with old blazes on the east line of the Maximo Moreno survey above and beyond the point claimed by the defendants as the northeast corner of the grant, and that said blazed and marked line extended on its course to the point as claimed by the plaintiff as the northeast corner of said Moreno grant, as will appear in plaintiff's bill of exceptions on that subject, No. 3.

"The bill of exceptions shows that on the trial of the cause, after the plaintiff had introduced his testimony in chief, and the defendants had introduced their evidence, consisting of depositions, documents, and the oral testimony of S. W. Bigham and John Marshall, and closed, the plaintiff, in rebuttal, then offered to prove by the witnesses David Moore, L. Moore, Webb Moore, Pat Pigham, F. H. Ayers, and J. W. Turner, a practical surveyor, that in 1881 they were on the east line of the Maximo Moreno grant for the purpose of an examination thereof; that they found the said line marked with old blazes, extending from the southeast corner thereof, on its right course, up to where S. W. Bigham and John Marshall said the two hackberries stood, as mentioned in their testimony, and that the blazes were found extending above and beyond the two hackberries for a distance of about 4000 varas, on the right course of the line, to the point of its intersection with the north or back line as that line would be fixed if run south 70 degrees east from the northwest corner, as the northwest corner would be fixed by its course and distance according to the field notes of the grant; that the blazes along the east line, which extended above and beyond the two hackberries, were apparently as old as those found below the said hackberries. At the point of intersection were found fallen and decayed hackberry timbers and hackberry stumps.

"And plaintiff further offered to prove by witness Stephens that he knew the location of the east line of the Maximo Moreno grant; that he was on it in 1859 and traced it to a point about three-fourths of a mile above the point where it was said S. W. Bigham had found the two small hackberries; that said line for said distance above said point was marked by blazes, and had the appearance then of being an old line. Plaintiff further offered to prove by witness Lemley that in 1867 he saw on the

course of the east line of the Moreno grant, about three-fourths of a mile above the corner known as the Bigham hackberry corner, a large ash tree having on it a blaze which then had the appearance of an old blaze, the stump of which tree is now (1886) standing on the east line of the Moreno grant, extended beyond said Bigham corner. To the introduction of which evidence the defendants objected that under the pleadings in this cause this is evidence in chief—is not in rebuttal of any new issue presented by the testimony of defendants, and because it proposes a reopening of the entire case, and defendants would have a right to go again into the testimony at large; which objections were sustained by the court, and the testimony excluded.

" The court erred in refusing to set aside the verdict, and should have sustained the motion of the plaintiff for a new trial, the verdict being contrary to the evidence in this, that the evidence of Duty showed * * * that in the year 1881, in tracing the eastern line on its course from its point of intersection with the north or back line (as claimed by plaintiff), he saw several trees marked with old blazes above or north of the hackberries, along the course of said eastern line extending from the hackberries (sometimes called the Bigham or McMillan corner), being the same hackberries mentioned by the witnesses Bigham and Marshall; and there was no evidence countervailing the effect which should have been given to the testimony of said Duty, who also testified that the survey was made by the original surveyor by beginning at the southwest corner and actually running the lines according to the calls for courses as contained in the field notes, as did also Johnson testify as to the same way of making the Moreno survey, and there was no evidence to the contrary."

We think the last assignment sufficently answers the preceding one.

In the case of Markham v. Carothers, 47 Texas, 27, this court quoted with approbation the following extract from Greenleaf:

" In some of the States the party is only required to make a prima facie case in the opening, and may reserve confirmatory proof in support of the very points made in the opening till he finds on what points his opening case is attacked, and then fortify it upon those points." See Mahan v. Wolf, 61 Texas, 489.

The case of Markham v. Carothers was decided in 1877. Since then the following provisions have been incorporated into the law:

Article 1297, Revised Statutes: " 5. Such party [the one upon whom rests the burden of proof on the whole case under the pleadings] shall then introduce his evidence."

" 7. He [the adverse party] shall then introduce his evidence."

" 9. The parties shall then be confined to rebutting testimony on each side."

Under this statute we think that if the defendants had offered any evidence disputing the testimony of Duty, or negativing the existence of the

blazed line beyond the hackberry corner, the excluded evidence, notwithstanding it was of the same character as that first introduced by plaintiff and proper to be introduced in support of the issues made by his own pleadings, ought to have been admitted, and its exclusion would have required a reversal of the case.

But when plaintiff had, as he now contends, made the desired proof by one witness, and there being, as we find and he contends, no evidence to the contrary, there was nothing for him to rebut, and the evidence if admitted would have been but cumulative, and as such it was not only within the discretion of the court to refuse it, but it was its duty to do so.

We find no error in the proceedings, and the judgment is affirmed.

*Affirmed.*

Delivered April 18, 1890.