## T. P. Yocham v. McCurdy & Daniels.

### No. 1083. Decided March 24, 1902.

**1.—Charge of Court—Weight of Evidence—Boundary.**

An instruction that the fact that the lines of a survey, as originally run and marked, included an excess of land was immaterial except as a circumstance, to be considered in connection with all the evidence, in following the footsteps of the surveyor and fixing the boundary, was not a charge on the weight of evidence. (Pp. 342-344.)

**2.—Same—Cases Discussed.**

The cases of Scott v. Pettigrew, 72 Texas, 328, and Ayers v. Harris, 77 Texas, 108, explained and reconciled; the former criticised but not overruled. (Pp. 343, 344.)

**3.—Purchase of Public Lands—Statute—Constitution—Homestead Pre-emption.**

Section 1 of the Act of April 5, 1889, in giving to a settler in good faith a right to purchase in preference to the right of another to a homestead donation, is not in violation of section 6 of article 14 of the Constitution securing homestead donation rights. (Pp. 344, 345.)

Questions certified from the Court of Civil Appeals for the Second District, in an appeal from Bosque County.

*J. L. Scott* and *N. R. Morgan,* for appellant.—The trial judge erred in the second paragraph of his charge, in which he instructs the jury, "that the fact that the lines and corners of the O'Connor survey, as originally run and marked upon the ground, include a greater or less quantity of land than is included in the field notes of the patent, becomes wholly immaterial, further than as a circumstance to be considered by you, for what you may deem the same worth, to aid you, if it does so, in connection with all the evidence in the case, in following the footsteps of the original surveyor, and in fixing the eastern boundary as originally located." Because said charge is upon the weight of evidence, and the fact of or the question of excess in the O'Connor survey should have been submitted and left to the jury to be considered by them in connection with all the other evidence, and without suggestion from the court as to what weight it was entitled to in determining the location of said eastern line. And because said charge was injurious to the plaintiff, Yocham, and was calculated to influence and did influence the jury in finding their verdict: 1 Sayles' Civ. Stats. (1897), art. 1317; Scott v. Pettigrew, 12 S. W. Rep., 163; Mayo v. Truder heirs, 12 S. W. Rep., 117; Blum v. Strong, 6 S. W. Rep., 167; Railway v. Murphy, 46 Texas, 356; Stooksbury v. Swan, 85 Texas, 563; Austin v. Talk, 26 Texas, 127; Howerton v. Holt, 23 Texas, 51; Sparks v. Dawson, 47 Texas, 147; Altgelt v. Brister, 57 Texas, 432; Ormond v. Hayes, 60 Texas, 180; Railway v. Wright, 62 Texas, 515; Dwyer v. Bassett, 63 Texas, 275.

The trial judge erred in the ninth paragraph of his charge wherein he in effect instructs the jury that the defendant Daniels, as an incloser of the vacant land upon which the plaintiff had previously settled as a homesteader, had a preference right to purchase said land as against said homesteader; because if the act of the Legislature (Acts 1889, page 48, 2 Sayles' Civil Statutes, article 4201, edition of 1897) under which said charge was given, grants a preference right to purchase to Daniels as an incloser it is unconstitutional and void, being contrary to and prohibited by article 14, section 6, and article 1, section 29, of the Constitution of Texas, 1876. Because by section 6 of article 14 thereof, it is provided that "To every head of a family without a homestead there shall be donated one hundred and sixty acres of public land upon condition that he will settle and locate said land and occupy the same for three years and pay the office fees due thereon." And because by section 29 of article 1 of said Constitution it is declared that "All laws contrary to the following provisions shall be void." 2 Sayles' Civ. Stats., art. 4201 (1897); Const. of Texas (1876), art. 1, sec. 29, and art. 14, sec. 6; See Sayles' Constitution of Texas (1893), pp. 507, 574; Williams v. Taylor, 19 S. W. Rep., 156; Hunt v. State, 7 Texas Civ. App., 231,

and authorities there cited; Dallam's Decisions, 475; Mellinger v. City of Houston, 68 Texas, 44; Zwerneman v. Rosenburg, 13 S. W. Rep., 485; Christmas v. Smith, 10 Texas, 129; Ex parte Towles, 48 Texas, 413.

*William M. Knight,* for appellees.—The jury were told that the real problem was to determine where the lines had been originally located. The charge is not upon the weight of evidence, because the jury were authorized by it to consider the fact of an overrun or underrun for every purpose for which the law considers it. It is the law that if the original lines can be ascertained, then the question of whether there is more or less land within them than called for in the patent is immaterial. Such a charge as this has been expressly sustained in Ayers v. Harris, 77 Texas, 108, and in Branch v. Simons, 48 Southwestern Reporter, 40. The instruction in this case is more carefully worded, and is less subject to criticism than even the charge in Ayres v. Harris or in Branch v. Simons.

In Bartlett v. Hubert, 21 Texas, 8, the following charge was approved: "That the lines actually run and the corners actually made must govern the survey, whether it corresponds with the lines called for in the grant or not, or whether the land included in the grant is too great or too small." The following cases illustrate the rule that to charge on the legal effect of a fact is not to charge on the weight of evidence: Gibson v. Hill, 21 Texas, 225; Hamberg v. Wood, 66 Texas, 177; Edwards v. Dickson, 66 Texas, 616; Railway v. Johnson, 50 S. W. Rep., 53; Insurance Co. v. Neal, 56 S. W. Rep., 91; Oil Co. v. Davis, 60 S. W. Rep., 453.

It is respectfully submitted that "the scrap land act" is not in violation of section 6, article 14, of the Constitution. This provision of the Constitution is not self-executing. It provides no method for selecting and surveying the land sought. It provides no method or tribunal for determining that it has been occupied as required. If the provision in question is not self-executing, then it should be treated as a command to the Legislature to legislate so as to give effect to the provision. It is submitted that the Legislature has obeyed this command.

The scrap act did not impose any other additional condition upon one seeking a donation than the Constitution imposed. It did provide that an actual settler having vacant land inclosed should have a right to purchase prior to that of a homesteader, but this was not imposing an additional condition on the homesteader. To deny to the Legislature the power to give this priority is to deny to it the power to dispose of the public domain. Section 6, article 14, does not confer a vested right to acquire the public domain so as to prevent the Legislature from making any other disposition of it. The right of the Legislature to dispose of the public domain has been too often recognized to be questioned now. As was said in Railway v. State, 12 Southwestern Reporter, 993, "The first Legislature that assembled after the adoption

of the Constitution passed a general law granting to railroad companies sixteen sections of land for each mile of road. The next Legislature disposed of all the lands in Greer County," etc. Repeatedly has the Legislature made disposition of parts of the public domain. Its right to do so has been often recognized by the courts, and particularly and in terms was it recognized in the above case. An unqualified disposition of the public domain certainly withdraws it from the settlement and occupancy of a homesteader under the provisions of section 6, article 14. If the Legislature has the power to dispose of the public domain permanently, then it certainly has the power to withdraw it from the location of a homestead donation man in a qualified manner.

The scrap act in no sense imposes any additional condition on the homesteader. The act was simply a plan to dispose of the scraps of public land scattered around over the State. It did not change the homestead donation laws in any particular. The Legislature could, if it had willed, have withdrawn these scraps from location for donation purposes. In Railway v. State, 12 Southwestern Reporter, 993, this language is used: "While the Legislature was bound at all times to respect the locations already made by settlers under the pre-emption laws, and surveys made for corporations, and all other vested rights, it was at no time required to abstain from disposing of the one-half that was subject to its control, to await the acquisition of future claims for any of said purposes."

In Hogue v. Baker, 45 Southwestern Reporter, 1006, this language was used: "We do not concur in the proposition that, because the Constitution gave the right to persons without homesteads to acquire by settlement donation, the right continues so long as any part of the public domain remained not specifically set apart to the school fund and not otherwise appropriated," etc. It was thus recognized by the court that section 6, article 14, did not confer a vested right to acquire a part of the public domain as a homestead donation." If the Legislature has the power to dispose of the public domain, it had the power to provide that certain portions of it peculiarly situated should be sold and not acquired for homestead donations. It likewise follows that the Legislature had the power to provide that an actual settler, who had unwittingly inclosed a portion of the public domain peculiarly situated, should have a right to purchase the same prior to that of one to acquire it as a donation.

GAINES, CHIEF JUSTICE.—This case comes to us upon certain questions certified for our determination by the Court of Civil Appeals for the Second Supreme Judicial District. The statement and questions are as follows:

"On May 1, 1894, appellant made actual settlement upon the 116 acres of land involved in this suit, in all particulars complying with the law conferring upon the head of a family the right to acquire a homestead upon unappropriated public lands. He was evicted therefrom by

appellees claiming to own the land as a part of the C. O'Connor survey, of which appellees were the owners, and appellant thereupon instituted this suit.

"In the trial court the judgment was for appellees, McCurdy & Daniels, which judgment on appeal before us was reversed at a former day of this term because of an error, as we held, in a charge of the court hereinafter set out, as will more fully appear from the original opinion by us filed October 19, 1901.

"The controversy arose and was determined upon the following further state of facts: As claimed by appellant, the land in controversy constitutes part of the unappropriated public domain of Texas, situated between the O'Connor 320-acre survey on the west and the Henry Billings survey on the east. Appellee Daniels was an actual settler upon adjacent land, which, together with the O'Connor survey and the land in controversy, had been continuously inclosed by him as a pasture prior to and ever since appellant's settlement as stated. Appellees prayed that if it should be found that the land in controversy was public land and not included within the boundaries of the O'Connor survey, as claimed by them, that appellee Daniels be decreed to have six months from the rendition of the judgment within which to purchase the same, and that his right to do so within such time be declared prior to the right of appellant to acquire a homestead donation thereon.

"As called for in the field notes, the O'Connor was a rectangular survey of 320 acres, its north and south lines being 950 varas long and its east and west lines 1900 varas in length. The beginning corner was its southwest corner, which alone seems to have been identified as originally established. From the beginning corner, the calls were as follows: 'Thence N. 60 E. 895 vrs. to a branch 950 vrs. to the S. E. corner in prairie; thence N. 30 W. 260 varas to a branch 1900 vrs. to the N. E. corner a mound; thence S. 60 W. 635 vrs. to a creek running south 950 vrs. to the N. W. corner in prairie; thence S. 30 E. crossing a creek running south 1900 varas to the place of beginning surveyed Sept. 28, 1846.'

"The south and east lines can not be identified by any marks of the original surveyor, the principal contention being whether, as insisted upon by appellant, there was a branch 895 varas from the beginning corner as called for in the field notes, or whether, as contended for by appellees, the branch called for on the south line was to be reached only by an extension of said line to a point 1295 varas from the beginning corner. We think it evident from the record that the conclusion reached on the trial was that the land in controversy is included within the boundaries of the O'Connor survey; and we also think it likewise evident that the jury, in fixing the south and east lines of the O'Connor survey so as to include the land in question, was controlled largely by the call for the branch on the south line. The evidence as to the identity of this branch was sharply conflicting, if in fact not strongly preponderating in favor of appellant's contention. If the contention of

appellees and the verdict of the jury as to the true boundaries of the O'Connor survey be sustained, it results in a large excess.

"In this condition of the evidence, the trial court, among other things, instructed the jury before whom the case was tried: 'That the fact that the lines and corners of the O'Connor survey as originally run and marked upon the ground include a greater or less quantity of land than is included in the field notes of the patent, becomes wholly immaterial further than as a circumstance to be considered by you for what you may deem the same worth to aid you, if it does so, in connection with all the evidence in the case, in following the footsteps of the original surveyor and in fixing the eastern boundary of said survey as originally located.'

"To which charge error was duly assigned in behalf of appellant Yocham, and which, as before stated, on the original hearing, we concluded, on authority of Scott v. Pettigrew, 72 Texas, 321, was erroneous and prejudicial; and the material question is thus presented, whether we were in error in so concluding,—that is to say, was the charge quoted and so given erroneous as a matter of law and was it prejudicial under the facts stated, and this question we certify to your honors for determination.

"Appellees also urgently insist that we certify a further question of law arising upon the court's charge and the evidence in the cause, and which question we have concluded to certify to your honors, should you deem it proper to consider it, the cause having already been reversed by us and motion for rehearing overruled.

"Appellant Yocham's right was predicated upon the facts stated in the beginning of this certificate. There was also evidence to the effect that one of appellees, N. H. Daniels, was an actual bona fide settler in Bosque County, Texas, upon patented lands adjacent to the O'Connor survey, which together with the O'Connor survey, with boundaries as claimed by appellees in this suit, was inclosed by said Daniels. Upon the evidence and appellees' asserted right to purchase the land in controversy in the event it was found to be vacant and not part of the O'Connor survey, as asserted in the pleadings of appellees, the court gave the following instructions:

"'9. Although you may believe that the land in controversy is vacant land and not part of the O'Connor survey, still, if the defendant N. H. Daniels is and has been an actual settler upon said tract of land or upon land adjacent thereto in good faith, and that said land has been and is actually inclosed by the fence of defendant, and that defendant has been and is claiming same as part of the O'Connor survey, and that he has not believed same to be vacant land, then, in such case, he would have the right to purchase same from the State within six months from the date said land is ascertained to be vacant.

"'10. If, therefore, you have found said land to be vacant, and if you further find from the evidence that said land has been and is situated within the inclosed lands of the defendant Daniels, and that said

Daniels is an actual bona fide settler in Bosque County, Texas, upon the lands adjacent to the said O'Connor survey, and that he has heretofore claimed and now claims same as part of the O'Connor survey,. and that he has not heretofore believed nor recognized the same to be vacant land, then you will find that defendant Daniels has the right to purchase said land within six months from this date from the State. But unless you so believe from the evidence, you will find against said defendant.'

"Appellee Daniels at no time has made an application to purchase the land in controversy as part of the public domain of the State of Texas,—he, as stated, at all times claiming the same to be part of the O'Connor survey.

"In view of another trial, we also undertook to determine whether clauses 9 and 10 of the court's charge, above quoted, were erroneous,. as assigned, and we concluded that they were and that such assignments. should be sustained; all of which will more fully appear from the original opinion filed herein, which will be transmitted with the record to your honors; and we therefore accordingly further certify for your determination the question, whether there be a conflict between section 6,. article 14, of the State Constitution, and section 1 of the act of the Legislature, approved April 5, 1899, upon which appellee Daniels' asserted right to purchase is predicated, and whether said clauses of the court's charge were erroneous as assigned."

We are of the opinion that the charge complained of by appellant is. not erroneous. It is well settled law in this State that the fact that the lines of a survey of a portion of the public domain made by the official surveyor for the purposes of a grant embrace more land than it purports to convey, or that the distances called for may fall short of those of the lines as actually run, neither destroys nor diminishes the grant. Hence, if in a case involving the question of the boundary of a survey, the undisputed evidence should show the true location of certain lines and such lines should include more land than is called for in the survey, we are clearly of the opinion that it would not be erroneous for the court to charge the jury that the lines as actually run should be taken as the true boundary lines of the survey and that the fact that there was an excess was wholly immaterial. But where the calls can not be reconciled and the evidence is conflicting—the lines as. claimed by one party embracing an excess while those claimed by the other embrace none—is it error to instruct the jury in effect that they may consider the excess as a circumstance to aid them in determining the true boundaries of the grant, but when they have determined the grant the excess becomes wholly immaterial? We think not. The propositions that when the boundaries are ascertained the excess is immaterial, and that when the evidence is doubtful as to the lines the excess may be looked to to aid the jury in determining their true location, are both correct as a matter of law, and it is not upon the weight of the evidence to so instruct the jury. It has been held by this court

that, in a case involving the question whether or not a conveyance is fraudulent as to creditors, it is the duty of the court not only to charge the law as to such conveyances, but to go further and to instruct the jury that certain circumstances tending to show a fraudulent intent, if established by the evidence, are to be considered by them in determining the question. Howerton v. Holt, 23 Texas, 52. Hence, as we think, it can not be held error to call the attention of the jury to the question of excess in a survey and to tell them that it may be considered for the purpose of determining the question of boundary and for that purpose only. Such was the effect of the charge in question in this case. An instruction which, in effect, directs the jury that they may consider a fact or circumstance in determining an issue in a case and which, neither by giving such circumstance undue importance or otherwise, intimates an opinion as to the weight which is due to it, is not a charge upon the weight of the evidence.

The charge in question is very like that which was held in Scott v. Pettigrew, 72 Texas, 328, to be a charge upon the weight of the evidence and prejudicial to the appellant. That in the case last cited was repeated in the same language in Ayres v. Harris, 77 Texas, 108, and was held not to be prejudicial to the appellant in the latter case. In our opinion in the mandamus proceeding which grew out of the present case, we intimated that the two last cases were irreconcilable. After a further consideration, we think we were in error as to that matter and that the two decisions are not in conflict. In each of those cases, the question was as to the boundary lines of the Maximo Moreno eleven-league grant; and the testimony upon the question was practically the same. In each, the excess claimed upon the one side and denied upon the other was very large. But in Scott v. Pettigrew, the verdict and judgment in the trial court was in favor of the party claiming the excess, while in Ayres v. Harris, the party who denied that any excess existed prevailed upon the issue. To reverse the judgment in either case, it was therefore necessary to hold not only that the charge was erroneous, but also that it was prejudicial to the party appealing. The position of the parties being changed upon the appeal, a charge prejudicial to the appellant in the one case was not only not necessarily to the prejudice of the appellant in the other, but was likely to have inured to his benefit. If Scott had prevailed in the former case, it may properly have been held that since his adversary claimed there was no excess, the latter could not have complained of the charge, though erroneous. Very clearly it was not prejudicial to the party, who claimed that the survey embraced more land than was called for in the field notes, to charge that the excess was immaterial. We therefore conclude that the opinion in the former was not overruled by that in the latter, and that the Court of Appeals was clearly justified in so holding.

But it is not clear to our minds that the charge in Scott v. Pettigrew was free from objection. In Ayres v. Harris, it is spoken of as "somewhat obscure, if not contradictory." In that charge the language was:

"If from the proof before you and under the instructions herein given you, you can fix the lines of the survey in harmony with its calls and the known corners, the fact, if you find it to be a fact, that said lines would include more than eleven leagues becomes wholly immaterial, and you will in such case not consider the extent of the area further than as a circumstance to aid you, in connection with all the evidence in the case, in following the footsteps of the original surveyor and fixing the true boundaries of said grant." It admits of the construction, and the jury may have understood it to mean, that if they could fix the boundaries of the grant, without regard to the excess, they were not to consider the excess for any purpose,—whereas the law is that it is a circumstance to be considered with the other evidence in determining the question of boundary. In the charge in the present case the language was: "That the fact that the lines and corners of the O'Connor survey as originally run and marked upon the ground include a greater or less quantity of land than is included in the field notes of the patent becomes wholly immaterial further than as a circumstance to be considered by you for what you may deem the same worth to aid you, if it does so, in connection with all the evidence in the case in following the footsteps of the original surveyor and in fixing the eastern boundary of said survey as originally located." This instruction in effect merely tells the jury that the excess may be considered in determining the lines of the survey and for that purpose only. It seems to us that the charges are distinguishable and that it is not necessary to overrule Scott v. Pettigrew in order to sustain the correctness of the instruction in this case.

In reference to the second question certified by the Court of Civil Appeals, we have to say that in our opinion section 1 of the Act of April 5, 1889, is not in conflict with section 6 of article 14 of the Constitution. The statute in question is as follows: "That any person desiring to purchase any of such appropriated public lands situated in organized counties of the State of Texas as contain not more than six hundred and forty acres, appropriated by an act to provide for the investment of the proceeds of such sale, approved July 14, A. D. 1879, may do so by causing the tract or tracts which such person may desire to purchase to be surveyed by the authorized public surveyor of the county in which such land is situated. The provisions of this act shall not be so construed as to prohibit the right of acquiring any of said lands under chapter 9, title 79, Revised Civil Statutes, within the bounds of the reservation here made; but any person shall have the same right of acquiring a homestead within this reservation, under the homestead donation laws of this State, as he may have had prior to the passage of this act; provided, where it is ascertained that any of such lands as contain not more than six hundred and forty acres is situated within the inclosed lands of any actual bona fide settler and resident of the State, such settler shall have the preference right for six months from the time that the same shall have been declared by the Commis-

sioner of the General Land Office to be vacant and subject to sale, to purchase as much of said land as may be embraced within his inclosure; provided, that said preference right shall not be given to any person who has inclosed any vacant land knowing the same to be vacant at the time of inclosing same." Laws 1889, p. 48. The following is the constitutional provision with which it is claimed to be in conflict: "Sec. 6. To every head of a family without a homestead there shall be donated one hundred and sixty acres of public land, upon condition that he will select and locate said land, and occupy the same three years and pay the office fees due thereon. To all single men of eighteen years of age and upwards shall be donated eighty acres of public land, upon the terms and conditions prescribed for heads of families."

We are of the opinion that it was not the purpose of this provision to confer upon heads of families and single men without a home an absolute right to a homestead donation, but merely to make it the duty of the Legislature to provide a means by which such persons might acquire homesteads from any part of the public domain not appropriated or devoted by it in its wisdom to any other purpose. To hold otherwise would be to declare all the public lands of the State neither appropriated nor directed or expressly authorized to be appropriated to any other purpose by the Constitution were exclusively reserved for the benefit of the homeless; and that the Legislature is without power to make any other disposition of such lands. We think it apparent from the statement of the proposition that such a result was not contemplated by the framers of our fundamental law. The rule as to the power of the legislatures of the States is that they have authority to make all laws not prohibited by the Constitution of their respective States or that of the United States; and we are aware of no provision in the Constitution of this State which inhibits the Legislature from providing for a sale of any portion of the public domain. Many legislatures which have met since the adoption of the Constitution have exercised this power, and their construction of that instrument should be followed by the courts unless it should clearly appear unwarranted.

We answer the second question in the negative.