## WILSON v. GIRAUD. (No. 7202.)

(Court of Civil Appeals of Texas. Galveston. Nov. 10, 1916. Rehearing Denied March 22, 1917. Dissenting Opinion, April 20, 1917. Second Rehearing Denied Oct. 6, 1921.)

1. Trespass to try title ⬡38(1)—Plaintiff, claiming under state's award of unappropriated land, has burden of proving it was vacant.

In an action in trespass to try title, where plaintiff claimed by award from the state of unappropriated land by virtue of a certificate subsequent to patents by the state under which defendant claimed, the burden of proving that such land was vacant was upon plaintiff.

2. Trespass to try title ⬡41(1)—Evidence held to make prima facie case for defendant.

In an action in trespass to try title, in which the defendant filed a cross-bill, undisputed facts in evidence *held* to make a prima facie case for the defendant.

3. Evidence ⬡460(6)—Title must be identified by description in state patent.

Title to land patented by the state must be identified by the description in the patent or in the award, and the title to such land so described cannot be questioned by proof that the surveyor who located it made a mistake in beginning the survey at a point different from one at which he should, or intended to, have begun it.

4. Trespass to try title ⬡41(3)—Undisputed evidence held to show defendant's title to land described in cross-bill.

In a suit in trespass to try title, *held*, that the undisputed evidence showed defendant had title to the land described in his cross-bill, and that there was no evidence to support the title claimed by plaintiff to any portion thereof.

5. Trespass to try title ⬡41(1)—Evidence held not to support judgment for plaintiff.

In an action in trespass to try title, *held*, that there was no evidence to support the judgment in favor of plaintiff, but that the undisputed evidence showed title in defendant.

On Motion for Rehearing.

6. Evidence ⬡387(4)—Unambiguous location calls cannot be varied by parol to create an ambiguity.

Unambiguous location calls by which a survey was located and patented cannot be varied by parol testimony, in a suit in trespass to try title, for the purpose of creating an ambiguity in the surveyor's calls.

7. Public lands ⬡175(7)—Survey ignoring other surveys held not entitled to weight in evidence.

In an action in trespass to try title, a survey which ignored other surveys, and created vacancies on which plaintiff attempted to locate a subsequent survey, under which he claimed through a state award, *held* not entitled to any weight as evidence in his favor.

Pleasants, C. J., dissenting.

---

⬡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Suit by E. A. Giraud against J. W. Wilson, in trespass to try title. Judgment for defendant for land sued for in the cross-bill, except such as was adjudged to plaintiff, and from the judgment for plaintiff, the defendant appeals. Order denying rehearing set aside, and questions certified to the Supreme Court. Questions answered. 231 S. W. 1074. Rehearing denied. Reversed and rendered for the defendant.

E. P. & Otis K. Hamblen, of Houston, for appellant.

Baker, Botts, Parker & Garwood, of Houston, for appellee.

LANE, J. This suit was instituted in the district court of Harris county on the 2d day of October, 1911, by E. A. Giraud, hereinafter called plaintiff, against J. W. Wilson, hereinafter called defendant, to recover the title and possession of a certain tract of land situated in Harris county, Tex., known as survey No. 2, in block A, by virtue of certificate No. 1562 (Confederate script), issued to Mrs. Martha Mings.

Plaintiff's petition was in the usual form of petitions in suits of trespass to try title. Defendant answered by general denial and plea of not guilty, and further specially pleaded "that he owned by fee-simple title and was in possession of 575 acres of land, being out of the northern part of the two surveys surveyed for Ashbel Smith and Wm. Ritchie, respectively, in 1874, and thereafter, in 1877, patented to Ashbel Smith, patents No. 228 and No. 229, vol. 29," which lies in a parallelogram and is bounded on the north by the south boundary line of the George Ellis survey and on the east by the Bloodgood survey, and further describes same by metes and bounds, which embraces all of the land sued for by plaintiff south of the George Ellis survey, and defendant disclaims as to all of the land sued for by plaintiff lying along the west boundary line of said Bloodgood survey north of the south boundary line of the Ellis survey which was not embraced in the boundaries of the land claimed by him. He also pleaded in reconvention against plaintiff for the land so claimed by him.

The cause was submitted to the court without a jury, who rendered judgment for the plaintiff for the land claimed by defendant, but for some reason, not made to appear by the record, denied the plaintiff judgment for the strip of land lying along and adjacent to the west boundary line of the Bloodgood survey north of the Ellis south line, sued for by him, to which defendant had entered a disclaimer. Judgment was for the defendant for the land sued for in his cross-bill, except such as was adjudged to plaintiff. From the judgment for plaintiff, defendant Wilson has appealed.

Appellant's main contention, which if sustained, will require a reversal of the judgment for appellee and the rendition of a judgment for appellant for the land claimed by him, is that the trial court erred in rendering judgment in favor of appellee Giraud for the land in controversy, and in not rendering judgment for defendant for same, because the undisputed evidence shows that the land in controversy was duly located for and awarded to Ashbel Smith and Wm. Ritchie in 1874, and duly patented to said Smith in 1877 by the state of Texas, and thereby became the titled property of said Ashbel Smith, and that appellant now owns and holds the title and possession of said land by mesne conveyances from said Smith down to himself; that the original field notes made by the surveyor of the land which was located for said Smith and Ritchie, and which were contained in the patent from the state to Smith, covered all the land in controversy; that there was no ambiguity in the original field notes made by the surveyor who located said land for Smith and Ritchie, nor in the field notes in said patent from the state to Smith, nor in the original field notes by which the Benjamin Barrow survey was located, and that therefore the testimony offered by plaintiff, and admitted by the court for the purpose of showing that the north line of the Smith and Ritchie surveys, which embraces the land sued for by plaintiff and that claimed by defendant, and the north boundary line of the Barrow survey, were actually located at a different place on the ground from the place called for by the field notes made by the surveyors of said two surveys, and upon which the state of Texas made the award and issued the patents to Smith and Barrow, was without any probative force, and was inadmissible because the descriptive matter called for in the grant must alone be looked to in determining the location of the boundaries of the land conveyed, there being no ambiguity in such descriptive matter.

That the descriptive matter contained in the patent must be looked to in determining the boundaries of the land patented, and that no extraneous matter may be shown and looked to in determining such boundaries, unless there is some latent ambiguity in the descriptive matter in the patent, and that the survey actually made by the locating surveyor, whose field notes are carried into the patent, is in legal contemplation the true survey, and, unless there exists some latent ambiguity in the descriptive matter in the calls in such survey, proof of extraneous facts cannot be made to vary such descriptive calls, we think is too well settled in this state to be now questioned. Hamilton v. Blackburn, 43 Tex. Civ. App.

153, 95 S. W. 1097, and authorities there cited; Goldman v. Hadley, 122 S. W. 282; Ruling Case Law, vol. 4, § 65, p. 125. Indeed, appellee admits as much in his brief. It follows, therefore, from what has been said, that the important and controlling questions are: (1) Was there any latent ambiguity in the descriptive calls in the patent from the state to Smith? and (2) was the evidence introduced by appellee sufficient to support the judgment rendered in his behalf by the trial court?

For the purpose of more clearly presenting the contention of the litigants as to the true location of the boundaries of the Smith and Ritchie surveys and surveys lying contiguous thereto, and of applying the evidence offered with relation thereto, we here present maps marked A and B, respectively, to wit:

. Map A represents the location of the Smith and Ritchie surveys, and those necessary to be mentioned for the purpose of this opinion, as contended by appellant, and is for all practical purposes a copy of the map or plat of said surveys as used by the General Land Office from 1874, the date of the survey and location of said Smith and Ritchie surveys by Surveyor J. J. Gillespie, up to the time said Surveyor Gillespie surveyed and located what is now shown on map B as the Martha Mings survey in the year 1886.

Map B, for all practical purposes, represents the location of the Smith and Ritchie surveys, and adjacent surveys, as made by Surveyor J. J. Gillespie in 1886, and of the new located Martha Mings survey shown on said map B. This map forms the basis of the contention of appellee (plaintiff) in the trial court.

Plaintiff, E. A. Giraud, claims the land sued for by him under the contention that Surveyor Gillespie, who surveyed and located the Smith and Ritchie surveys in 1874, and which were thereafter, in 1877, patented to Ashbel Smith, made a mistake in his first descriptive call running northward, in that he called for the south line of the George Ellis survey, while as a fact he began the survey at a point on the north line of the Barrow survey, which was 2,270 varas south of said Ellis south line, and ran north 80° 30′ west 1,600 varas, not with the west line of the Bloodgood survey, as called for in his original field notes by which said Smith survey was located and patented, but several hundred varas to the west thereof to a point 670 varas or more short of the Ellis south line, and therefore there was left a vacant. unappropriated body of land between the south line of the Ellis and the north line of the Smith and Ritchie surveys as patented; that in 1886, some 12 years after having located the Smith and Ritchie surveys, said J. J. Gillespie made another survey in the same locality, and in so doing discovered his said former mistake, and upon the vacant unappropriated land so discovered he located the Martha Mings survey, shown on map B; that on the 21st day of November, 1907, the state awarded to plaintiff said unappropriated land upon this application therefor.

[1] If there was such vacant unappropriated land lying just south of the south line of the Ellis survey, as contended by plaintiff, it was subject to award by the state in 1907, and the award made to plaintiff passed the title to same to him. The burden of proving that such vacant and unappropriated land existed was upon plaintiff. The next questions, then, for our determination are: Has he made such proof? Does the evidence authorize a judgment in his favor? The undisputed evidence shows the following facts: .

234 S.W.—8

[2] On the 10th day of August, 1824, the Wm. Bloodgood league survey, shown on the maps A and B, was surveyed and located, and is described as beginning at the northwest corner, a stake; thence S. 9½° E. 5,000 varas to a stake for southeast corner; thence S. 80½° W. 3,500 bayou, 5,000 varas, a stake for its southwest corner; thence N. 9½° W. 5,000 varas to its northwest corner, a post from which an elm marked "W. B." bears north 50° W. 1 vara, a water oak marked "W. B." bears S. 25° W. 6 varas; thence N. 80½° E. 5,000 varas to beginning; that the location of the northwest corner and the west line of the Bloodgood survey are well established, easily found, and not questioned; that on the 17th day of August, 1835, the George Ellis survey, shown on said maps, was surveyed and located by field notes as beginning at a stake on the west bank of Cedar bayou north of the William Bloodgood north line; thence S. with the meanders of said bayou to the north line of said Bloodgood survey; thence with the Bloodgood north line S. 80½° W. 950 varas to Bloodgood's northwest corner; thence S. 9½° E. 3,400 varas, a stake and mound on the Bloodgood west line for corner; thence S. 80½° W. 4,827 varas, a stake, etc., as shown by said maps; that the location of the south line of the Ellis is easily found and located; that on the 24th day of August, 1835, the Bloodgood augmentation shown on said maps was surveyed and located and described as lying wholly on the east side of Cedar bayou, and as having its most southern northwest corner at a cedar 1+ inches in diameter on the east bank of said bayou, which is shown to be on the south line of the Bloodgood league survey; that such survey is located as shown on said maps and is 702 varas in width; that in 1835 the Benjamin Barrow survey, shown on said map A, was surveyed and located and described as beginning at a stake and mound on the west bank of Cedar bayou, and on the south line of a league granted to William Bloodgood from which a pine 10 inches in diameter bears N. 70° E. 85/10 varas, and an elm 8 inches in diameter bears S. 60° E. 4 varas distant; thence with the south line of the Bloodgood S. 80½° W. 4,000 varas, etc., as shown on said map A; that on the 10th day of August, 1835, the Jacob Armstrong survey shown on said maps was located as there shown; that the map or sketch of the Bloodgood, Ellis, Bloodgood augmentation, B. Barrow, and Jacob Armstrong surveys, as used in the General Land Office in 1879, represented the location of said surveys as represented on the map A, and that said location of said surveys was so shown by all maps with reference thereto up to 1886, at which time Surveyor Gillespie made a plat or map showing otherwise, as shown by map B copied in this opinion; that on the 23d day of Decem-

ber, 1874, J. J. Gillespie, county surveyor of Harris county, while in possession of the facts above stated with reference to the location of the Bloodgood, Ellis, and Barrow surveys, each to the other, as then shown by the Land Office map and descriptive calls, went upon the ground, surveyed, platted, and by metes and bounds described the Smith and Ritchie surveys exactly as now contended for by appellant, and as shown by map A, embracing all the land sued for by appellee south of the George Ellis line, now claimed by appellant.

In surveying the Smith survey in 1874, said Gillespie, by his field notes and plat by which said survey was located and patented, shows that he began at a point on the north line of the Barrow survey 1,500 varas from Cedar bayou, which was the southwest corner of the Bloodgood survey if the calls for the north line of the Barrow then in his possession were correct. From thence he ran N. 9½° W. 1,600 varas, with the west line of the Bloodgood, to the southeast corner of the Ellis as called for by the field notes in his possession and as shown by the Land Office plat of said Bloodgood, Ellis, and Barrow surveys in his possession, or within his knowledge. From thence he ran south 80½° W. with the south line of the Ellis, as shown by the field notes and plat in his possession, 1,471 varas to a stake. From thence he ran south 9½° E. 1,600 varas, to a stake in the north line of the Barrow survey, and from thence N. 80½° E. 1,471 varas with said line to the place of beginning. Taking, then, the undisputed evidence, considering the fact that Gillespie must necessarily have had in his possession the descriptive calls for the Bloodgood, Ellis, and Barrow surveys, forming the boundaries of the land he was surveying, and with the knowledge of the existence of the Land Office plat of said surveys, shows conclusively that in 1874 he actually made the survey of the Smith as called for in the field notes and plat thereof, which he made and furnished and by which the Smith survey was located and patented, for and to Ashbel Smith. The undisputed facts show the footsteps of Gillespie in making said Smith survey in 1874. The same may be said of the facts showing the location and patent of the Ritchie. The land patented to Ashbel Smith passed by mesne conveyances to appellant. These undisputed facts made a prima facie case for appellant, and, unless overcome by other admissible evidence, he is entitled to recover.

[3] We will now discuss the evidence relied upon by appellee (plaintiff below) to show that a part of the land upon which the Martha Mings survey was located in 1886 by Surveyor Gillespie was not actually embraced in the survey made by the same surveyor in 1874.

In June, 1871, the owners of the whole of the Barrow one-fourth league survey conveyed to Roseman, Milam & Bro. the south half of said survey, which said survey was 1,470 varas in width, it being stated in the deed of conveyance, however, that said south half was to contain 553½ acres, and no more.

S. P. Sjolander, a witness for plaintiff, testified that he moved to the locality where the Barrow survey is situated in 1871; that he had lived near what had been generally understood to be the north boundary line of the Barrow survey ever since, except for about six months; that there were marked trees along said line; that at the point where this line intersected Cedar bayou there were some elm trees that had surveying marks on them, a cross mark, and that there was also a large pine tree that finally blew down near that point; that after it blew down he noticed three marks which extended through the sap into the heart of the tree; that he had cut wood on each side of said marked line, and tried to avoid cutting the marked line trees; that in 1878 or 1879 Roseman, Milam & Bro. (parties who purchased the south half of the Barrow) constructed a fence on the line above mentioned, which he (witness) knew by general reputation to be the north line of the Barrow one-fourth league; that the fence so constructed has remained practically in the same place ever since its construction; that he knows where the Hunt tract (shown on map B) is situated; that it has always been understood that it was bounded on the south by the north line of the Barrow; that in fact the fence constructed by Roseman, Milam & Bro. on the north line of the Barrow inclosed the south side of said Hunt tract; that he knew County Surveyor J. J. Gillespie, and was present when he made some surveying on the Barrow survey; that at that time there were trees with marks on them along the place where the fence erected by Roseman, Milam & Bro. ran; that Gillespie at that time got his line at that place; he considered that was the line.

It is shown by the undisputed evidence that, at the time Roseman and Milam erected the fence testified to by Sjolander, they did not own the north half of the Barrow survey, but that they purchased the same in 1881, 2 years or more after said fence was built. It is also shown that in September, 1886, 12 years after Gillespie had surveyed, located, and platted the Smith and Ritchie surveys, and 9 years after they had been patented to Ashbel Smith according to Gillespie's first survey and plat, he went to the same locality for the purpose of surveying and locating the Martha Mings survey, and at that time, for some reason, in determining the north line of the Barrow he began at the point on the bayou where Sjolander contends the north line of the Barrow be-

gan, which is a line extending westward from the dividing line between the Jacob Armstrong and Bloodgood augmentation surveys, shown on the maps, and is 702 varas south of the south line of the Bloodgood league, with which it was to run according to the field notes by which it was located. However, having at that time so determined and fixed said north line of the Barrow, he proceeded to resurvey and re-establish the boundaries of the Smith and Ritchie surveys by beginning at a point S. 80½° W. 1,500 varas from Cedar bayou, on the line he had determined to be the north line of the Barrow. This carried him several hundred varas too far west to reach the west line of the Bloodgood league in running the course northward, called for in his original field notes, made for the Smith survey. In making this resurvey in 1886, Gillespie has sought to separate all those surveys mentioned as having common boundary lines, and to create vacant, unappropriated land between all of said old surveys of 40 years' standing and to bring about the anomalous conditions presented by map B, introduced by appellee, and which forms the basis of his suit.

The testimony of appellee's witness Omohundro was to the effect that the northwest corner of the Bloodgood league was established by the existence of the original bearing trees called for by the surveyor who located this survey in 1824. His testimony on this point is undisputed, as well as his testimony that the west boundary line of the Bloodgood and southeast corner of the Ellis are easily found and recognized. He places this corner on the west line of the Bloodgood league S. 9½° E. 3,400 varas from the northwest corner of the Bloodgood, and N. 9½° E. 1,600 varas from the southwest corner of said Bloodgood. He does not pretend by any of his testimony to show at what point Gillespie began his survey of the Smith survey in 1874. From information which he gathered outside of any of the descriptive calls in any of the surveys mentioned, and contradictory of such calls, undertakes to establish the north line of the Barrow 702 varas south of the south line of the Bloodgood, with which it was said to run in the original field notes by which it was located in 1835. In fact, we find no evidence in the entire record which tends to contradict the contention for appellant that, when Gillespie first surveyed the Smith survey, he began at the southwest corner of the Bloodgood and ran its east line N. 9½° W. 1,600 varas, with the Bloodgood west line, to the Ellis south line, as called for in his field notes. There is no ambiguity in this descriptive call, either patent or latent, but on the contrary the uncontradicted evidence shows that such call must have clearly indicated his footsteps in making such survey.

If it be conceded that the north line of the Barrow is where appellee contends it is, as shown by the map B, this fact would not affect the title of appellant to the land patented to Ashbel Smith in 1877. The title to land patented by the state must be identified by the description given in the patent or in the award, and the title to such land so described cannot be questioned by proof that the surveyor who located it made a mistake in beginning the survey at a point different from one at which he should, or intended to, have begun it. Fulton v. Frandolig, 63 Tex. 330–333; Converse v. Langshaw, 81 Tex. 275, 16 S. W. 1031.

In Ruling Case Law, vol. 4, § 56, p. 117, it is said:

"In surveying a tract of land according to a former plat or survey, the surveyor's only duty is to relocate, upon the best evidence obtainable, the course and lines at the same place where originally located by the first surveyor on the ground. In making the resurvey he has the right to use the field notes of the original survey. The object of a resurvey is not to dispute the correctness of or to control the original survey, but to furnish proof of where the lost lines or monuments were. The original survey in all cases must, whenever possible, be retraced, since it cannot be disregarded or needlessly altered after property rights have been acquired in reliance upon it. On a resurvey to establish lost boundaries, if the original corners can be found, the places where they were originally established are conclusive, without regard to whether they were in fact correctly located."

Again, in same volume, section 65, p. 125, it is said:

"While latent ambiguities may be explained, parol evidence is inadmissible in the absence of surprise, mistake, or fraud, to vary in any way a description of land which is complete and clear, and, where the description of premises conveyed in a deed is definite, certain, and unambiguous, extrinsic evidence cannot be introduced to show that it was the intention of the grantor to convey a different tract."

In the case of Lyon v. Waggoner, 37 Tex. Civ. App. 205, 83 S. W. 46, decided by the Court of Civil Appeals at Fort Worth, and affirmed by the Supreme Court without written opinion (101 Tex. 665, 83 S. W. 46), it is said:

"Where the issue is the location of a boundary line between adjoining lands, that method of constructing the line should be adopted which will present an arrangement of several surveys as nearly identical with that shown by the original map as possible, instead of an observance of courses and distances, which would result in the destruction of the original configuration of the surveys."

[4] To sustain the contention of appellee as to the proper location of the boundaries of the several continuous surveys above mentioned, as shown by map B, would dis-

arrange all of the former common boundaries of said surveys, pull them apart, and result in the destruction of the original configuration of said surveys as platted. To sustain such contention it must be shown (1) that the surveyor who surveyed the Barrow survey in 1835 made a mistake in calling for a beginning point on the west bank of Cedar bayou, on the south line of the Bloodgood, and from thence running westward with said line, and that as a fact he began 702 varas south of said Bloodgood south line, leaving a body of vacant unappropriated land lying on the west side of the bayou opposite the Bloodgood augmentation 702 varas in width which appears on map B to be still unappropriated; (2) that the surveyor who located the Ellis made a mistake in supposing that he ran the east line of the Ellis 3,400 varas with the Bloodgood west line, and set its southeast corner in said line, but on the contrary he ran several hundred varas to the west thereof and left a narrow strip 3,400 varas long between the two surveys; (3) that Gillespie, in surveying the Smith survey in 1874, made a mistake in assuming that he ran with the Bloodgood west line at all, and in assuming that he reached the Ellis southeast corner at a distance of 1,600 varas from the southwest corner of the Bloodgood, and that as a fact he began 702 varas further south, and several hundred varas further west, than the south and west lines of the Bloodgood, respectively, and in running north left a narrow strip of land not located, along the line of the Bloodgood west line, south of the Martha Mings survey. Such contentions cannot reasonably be sustained. We have reached the conclusion that the undisputed evidence shows that appellant has title to the land described in his cross-bill, and that there is no evidence to support the title claimed by appellee to any portion thereof. The testimony of Sjolander to the effect that he knew where the north line of the Barrow was because Roseman and Milam fenced it in 1878 or 1879, if of any weight, is weakened, if not entirely destroyed, by the undisputed fact that Roseman and Milam never purchased the north half of the Barrow until 1881. Evidently these parties marked out the line dividing the south half, which they first purchased in 1871, from the north half, and built a fence thereon in 1878 or 1879, and that Sjolander mistook this line for the north line of the Barrow survey.

[5] Having reached the conclusion that there is no evidence to support the judgment rendered by the trial court for the appellee, E. A. Giraud, and that the undisputed evidence shows title in appellant for the land sued for by him, so much of the judgment of the trial court as was in favor of appellee, E. A. Giraud, is here reversed, and judgment is here rendered for appellant, J. W. Wilson, for the whole of the land sued for by him in his cross-bill.

Reversed and rendered.

### On Motion for Rehearing.

In our original opinion we held that the evidence adduced was insufficient to support the judgment rendered in favor of appellee, and that judgment thereupon should have been rendered in the trial court for appellant, and we therefore reversed the judgment so rendered and rendered judgment for appellant. In appellee's motion for rehearing filed herein he earnestly and vigorously insists that there is sufficient evidence to support the judgment rendered in his favor by the trial court, and that this court erred in holding to the contrary.

In our original opinion we discussed the evidence at considerable length, but, in view of appellee's very earnest insistence that we are in error, we deem it advisable to direct attention to other facts shown by the evidence, not specially mentioned in our original opinion.

[6] Counsel for appellee admits that, if there is no ambiguity in the location of calls by which a tract of land is located and patented, resort to parol testimony to vary such calls is inadmissible. This being true, then it is equally true that the unambiguous location calls by which the Barrow survey was located and patented cannot be varied by parol testimony for the purpose of creating an ambiguity in the calls of the surveyor who in 1874 surveyed and located the Ashbel Smith survey. Of course counsel does not, and we suppose will not, dispute this proposition, but we think his contention, in effect, disputes it. The calls of the surveyor who located the Barrow in 1835 were made and fixed as follows: The Bloodgood, shown on maps in original opinion, was surveyed and located in 1824, and its south line was established by beginning at its southeast corner, and running thence S. 80½° W. 3,500 varas to Cedar bayou; thence same course from said bayou 1,500 varas for its southwest corner. The location of this south line of the Bloodgood is fixed and not disputed. The original field notes of the Barrow, by which it was located and patented, calls to begin on the west bank of Cedar bayou on the south line of the Bloodgood, to run thence with said Bloodgood south line S. 80½° W. 4,000 varas for corner; thence southwardly 1,490 varas for southwest corner; thence eastwardly 4,230 varas to said bayou for southeast corner; and thence up said Cedar bayou, with its meanders, to place of beginning. There is no call for any survey except the Bloodgood. If there is any ambiguity in these calls, we are unable to discover it. And yet counsel for appellee insists that appel-

lee may show, by the uncertain and contradictory testimony of his witness Sjolander, that the north line of the Barrow is not where the original surveyor places it by his location calls, but 702 varas south thereof. Of course, if this may be done by parol, then appellee has, by the testimony of Sjolander, raised the question of an ambiguity in the locative calls of the Ashbel Smith made by J. J. Gillespie in 1874, but we do not think that any such ambiguity can be so created by parol testimony. Davis v. George, 104 Tex. 106, 134 S. W. 326; Dunn v. Land, 193 S. W. 698; Jamison v. New York & T. Land Co., 77 |S. W. 969, and authorities cited therein.

In appellee's motion for rehearing he says that he is at a loss to know why this court in its opinion seeks to tie the beginning corner of the Ashbel Smith survey to the southwest corner of the Bloodgood league, rather than to the north line of the Benjamin Barrow survey. This court has not sought to tie the beginning corner of the Smith to any particular corner or line, but has made a most earnest effort to apply the facts as disclosed by the record to the matter in dispute, and in so doing we find, in our opinion, in every instance that the beginning corner of the Smith was on the north line or tied to the north line of the Barrow, but we decline to follow appellee in locating the Barrow north line 702 varas further south than the unambiguous field notes of the surveyor who located it placed it. But, for fear that we have not made it entirely clear as to why we have also found that the southwest corner of the Bloodgood was the beginning corner of the Ashbel Smith, as made by J. J. Gillespie, surveyor, in 1874, we make this further explanation. In fixing and establishing the southeast corner of the Bloodgood the surveyor ran S. 80½° W. 1,500 varas from Cedar bayou to stake for corner. In locating the north line of the Barrow the locating surveyor began on the west bank of Cedar bayou on the south line of the Bloodgood, which is not in dispute, and ran S. 80½° W. with said south line, passing the Bloodgood southwest corner.

In locating the Ashbel Smith in 1874, Surveyor J. J. Gillespie in his field notes calls to begin on the north line of the Benjamin Barrow one-fourth league at a point 1,500 varas S. 80½° W. from Cedar bayou. Now, keeping in mind that the Bloodgood southwest corner is fixed at 1,500 varas S. 80½° W. from Cedar bayou, and that the north line of the Barrow begins on and runs S. 80½° W. with the south line of the Bloodgood, passing its southwest corner at 1,500 varas, and that the Smith beginning corner is fixed by the surveyor at a point 1,500 varas S. 80½° W. from the west bank of Cedar bayou, how could it be found otherwise than that the southwest corner of the Bloodgood and the beginning corner of the Smith are at the same point? But this is not all. The undisputed facts show that the west line of the Bloodgood is 5,000 varas in length; that the Ellis survey, shown on the maps in original opinion, is tied to said west line on the east, and that 3,400 varas of said west line, beginning at the northwest corner of the Bloodgood, is the east line of the Ellis, and that there are only 1,600 varas of the Bloodgood west line extending south of the Ellis southeast corner. Now Surveyor Gillespie, in surveying the Smith in 1874, calls to run from its beginning corner 1,600 varas with the west line of the Bloodgood to the Ellis southeast corner. This again accounts for our finding that the beginning corner of the Smith and the southwest corner of the Bloodgood are at the same point, it being shown that the location of the west line of the Bloodgood was not a disputed question, and that the original bearing trees fixing and establishing the northwest corner of the Bloodgood are still to be found. Does not the fact that, when Gillespie sought a beginning corner for the Smith on the north line of the Barrow, he adopted a point just 1,500 varas S. 80½° W. from Cedar bayou, exactly the course and distance from said bayou called for in the Bloodgood field notes for its southwest corner, conclusively show that both points are one and the same? Would it not, indeed, be a strange and remarkable coincidence that, if the two points were at different places 702 varas apart, they would each be just 1,500 varas |S. 80½° W. from Cedar bayou? Is it not conclusive from the facts stated that Gillespie, in locating the Smith southeast or beginning corner in 1874, was trying to and thought he had located it at the southwest corner of the Bloodgood, so as to run 1,600 varas with the Bloodgood west line, so as to reach the southeast corner of the Ellis, and in this way locate the adjacent unlocated land in some systematic form, rather than to so construct his surveys as to leave narrow strips and tracts of unappropriated or unlocated land between located surveys, as indicated by map B? We think all these questions, without doubt, should be answered in the affirmative.

Appellee also insists that, as Surveyor Gillespie surveyed and located the Ashbel Smith survey in 1874, and 12 years thereafter, to wit, in 1886, returned to the same field of operation, and then surveyed or resurveyed and platted the same survey as shown by map B in the original opinion, his so doing was equivalent to his testifying that the last plat indicated his actual footsteps in making the first survey in 1874, and that he made a mistake in calling for the Ellis south line in said first survey, and that as a fact he did not in the first survey reach the Ellis by 707 varas, the width of Martha Mings survey, shown on said map, and that this testimony, together with other testimony in-

troduced by him, is sufficient to support the judgment of the trial court.

[7] We cannot agree to this contention. If the original field notes made of the Smith, by which it was located and patented, are definite and without ambiguity, Gillespie could not, if he had been called as a witness, have given parol testimony tending to vary such unambiguous field notes by which said survey was patented, nor could he have been permitted by parol testimony to vary the unambiguous field notes by which the Benjamin Barrow north line was tied to the south line of the Bloodgood league, and thus create an ambiguity in the original field notes by which the Smith was located and patented in 1874. We think it obvious from an inspection of the plat of the Smith, and contiguous surveys made by Gillespie, by which he undertook to locate the Martha Mings survey in 1886, as shown by said map B, that in making said plat and survey he disregarded all former surveys and undertook to pull apart surveys which had been shown to have common division lines for 50 years prior to his said survey in 1886, and create vacancies upon which to locate the Martha Mings. This fact was so apparent to the trial court that he refused to decree to appellee the strip shown on said map lying between the Bloodgood and Ellis, sued for by appellee, although appellant disclaimed as to the same. We do not think the fact of Gillespie's last survey should be given any weight whatever in favor of sustaining the judgment of the trial court.

Before concluding, we deem it advisable to state that the undisputed evidence shows that on June 9, 1881, long after Sjolander recognized the line now claimed by appellee as the north line of the Barrow survey, the north half of the Barrow was conveyed to Roseman, Milam & Bro., who at that time owned the south half of said survey, and the deed by which said north half was conveyed calls to begin on the south line of the Bloodgood and to run with it westwardly. We think this fact conclusively shows that as late as June 9, 1881, general reputation did not locate the north line of the Barrow 702 varas south of the Bloodgood south line, as testified by Sjolander.

We see no reason why we should recede from the conclusions reached in our original opinion. We therefore overrule the motion.

PLEASANTS, C. J. (dissenting). I cannot agree with my Associates in holding that appellee's motion for a rehearing should be refused, and in compliance with the statute shall briefly state the grounds of my dissent from the conclusions reached by the majority of the court. I was not present when my Associates originally decided this case, and was therefore not prepared to record my dissent when the decision was first announced, but an investigation of the record on motion for rehearing has convinced me that there is an issue of fact in the case, and therefore we are not authorized to reverse and render the judgment of the trial court.

The land owned by appellant is 575 acres on the Ashbel Smith and William Ritchie surveys. These surveys were located by J. J. Gillespie, county surveyor of Harris county, on December 23, 1874. The original field notes and patent describe the Ashbel Smith survey as follows:

"Beginning at a stake on the north line of B. Barrow's one-fourth league survey 1,500 varas from Cedar bayou in prairie; thence N. 9½° W. 1,600 varas with the west line of the Wm. Bloodgood league to a stake in prairie, the southeast corner of George Ellis league; thence S. 80½° W. with the south line of George Ellis league 1,471 varas to a stake in prairie; thence S. 9½° E. 1,600 varas to a stake in said Barrow's north line; thence N. 80½° E. 1,471 varas with Barrow's line to the beginning, containing 417 acres of land."

The field notes of the William Ritchie are as follows:

"Beginning at a stake in the north line of Benjamin Barrow's one-fourth league survey, being 2,971 varas from Cedar bayou; thence N. 9½° W. along the western boundary of Ashbel Smith's survey 1,600 varas, to a stake in prairie in the south line of George Ellis league; thence S. 80½° W. along said south line of Ellis league 1,256 varas, to a stake in said line in prairie; thence S. 9½° E. 1,600 varas to a stake in H. F. Gillett's north line 227 varas from Barrow's northwest corner and the northeast corner of said Gillett's survey; thence N. 80½° E. along said Gillett's and Barrow's north lines to place of beginning, 1,256 varas, containing 356 acres."

In September, 1886, J. J. Gillespie, the same surveyor who located the Ashbel Smith and Wm. Ritchie surveys, located for the state of Texas, by virtue of Confederate script No. 1563, in the name of Martha Mings, a survey of 640 acres, the field notes of which are as follows:

"Beginning at the most southerly southeast corner of land grant in name of Geo. Ellis, stake corner in prairie; thence N. 9½° W. 3,400 varas to corner in prairie, in inner southeast corner of said Ellis; thence N. 80½° E. 550 varas to corner in prairie on northwest corner of Wm. Bloodgood's league survey; thence S. 9½° E. 4,093 varas, the northeast corner of survey in name of A. Smith on Bloodgood's west line; thence S. 80½° W. 2,512 varas, to corner in prairie, Wm. Ritchie's north line; thence N. 9½° W. 693 varas, to corner in prairie, south line of said Geo. Ellis; thence N. 80½° E. 1,962 varas to the beginning."

Appellee made application for the purchase of the Mings survey on November 8, 1907, and on November 21, 1907, the application was approved and the land sold him by the Commis-

sioner of the Land Office in accordance with the statute regulating the sale of public lands. Appellant has title to 575 acres of land off of the north ends of the Smith and Ritchie surveys. This 575 acres is described as follows in the deed under which appellant acquired title:

"Beginning 7 varas from the northeast corner of the Ashbel Smith survey, patent No. 288, vol. 29, on the west side of the county road, on the south line of the George Ellis league; thence S. 9½° E. 1,193 varas along the west side of said road, to the northeast corner of 400 acres conveyed by Ruby to Porter; thence S. 80½° W. 2.770 varas to said Porter's northwest corner on the west line of the said Ritchie survey; thence N. 9½° W. 1,193 varas to the northwest corner of the said Ritchie survey on the south line of the George Ellis league; thence N. 80½° E. 2,770 varas to the place of beginning."

It is apparent from the field notes of appellant's land that his boundaries conflict with the Mings survey owned by appellee, if the north line of the Smith and Ritchie surveys, as actually located on the ground, are identical with the south line of the George Ellis survey, as the calls in the field notes of the Smith and Ritchie before set out indicate. The true location of the Smith and Ritchie surveys depends upon the true location of the north line of the Benjamin Barrow survey. The field notes of this survey are as follows:

"Beginning at a stake on the west bank of Cedar Bayou and on the south line of a league of land granted to William Bloodgood, from which a pine 10 inches in diameter bears N. 70° E. distant 8.5 varas, and an elm 8 inches diameter bears S. 60° E. distant 4 varas; thence with said Bloodgood's line S. 80° 30' W. 4.000 varas, stake and mound in prairie for northwest corner; thence S. 9° 30' E. 1,490 varas, set stake and raised mound in prairie for southwest corner; thence N. 80° 30' E. 4,230 varas, to the bank of said Cedar bayou, corners on three small pin oaks, from which another pin oak 8 inches diameter bears S. 35° W. distant 5.5 varas, and a pine 30 inches diameter bears N. 11° W. distant 10.4 varas; thence up said Cedar bayou with its meanders to the place of beginning."

If the north line of the Barrow was located as called for in the field notes of the survey—that is, if it began on the west bank of Cedar bayou on the south line of the Wm. Bloodgood survey, and ran thence with said line S. 80° 30' W., the distance called for—there is no ambiguity in the field notes of the Smith and Ritchie surveys, because the lines of the Bloodgood survey and the George Ellis survey can be definitely located on the ground by course and distance from the established and known northwest corner of the Bloodgood, and the course and distance called for in the Smith and Ritchie field notes would make their north line and the south line of the Ellis survey identical, and the Mings survey,

so far as it conflicts with the Smith and Ritchie, would be void.

If, however, the Barrow survey was not actually located along the south line of the Bloodgood, but 702 varas south of said line, the field notes of the Smith and Ritchie are ambiguous when applied to the ground, and it was a question for the jury to determine from all the evidence where the lines of said surveys were actually placed by the surveyor who made the original location.

There is no testimony that any marked line can be found extending from the southwest corner of the Bloodgood survey, the course and distance called for in the Barrow field notes for the north line of the Barrow survey, nor any testimony that the marked trees called for at beginning corner of the Barrow on the west bank of Cedar bayou in the south line of the Bloodgood survey can now be found, or ever existed, and there are no marks of any kind called for or shown to exist in the south line of the Bloodgood survey west of Cedar bayou, nor in the west line of said survey south of the George Ellis survey. Two witnesses placed the north line of the Barrow 702 varas south of the south line of the Bloodgood. The existence of this marked line beginning on the west bank of Cedar bayou 702 varas south of the Bloodgood south line, and extending the course and distance called for the north line of the Barrow, is established by the undisputed evidence. Upon the issue of whether this marked line was the north line of the Barrow as it was originally located, the witness Sjolander testified:

"I am acquainted with the boundaries and lines of a survey of land down there known as the Benjamin Barrow quarter league survey. I came to Cedar bayou, it will be 41 years to-morrow, the 6th of June, 1871. My home has been there ever since, but I may have been off for maybe six months, something like that, but I call that my home. I live maybe 700 or 800 or 1.000 yards, something like that, from the Benjamin Barrow north boundary line. I never measured it; I have lived in that vicinity about 41 years.

"The north line of the Benjamin Barrow survey was fenced by Roseman, Milam & Bro. It was in the latter part of the '70's—'78 or '79, something like that—that the fence was constructed there. Before those fences were constructed I had seen and knew and was familiar with the north boundary line of this Barrow survey. I cut wood on both sides of the line, and we always tried to avoid cutting down line trees. I knew Mr. J. J. Gillespie, a surveyor, many years ago. The north line of the Benjamin Barrow survey was always considered to start at a little gully down on the bayou, right opposite the Armstrong survey in Chambers county; there is where they always got their line down there, and I remember when Mr. Gillespie was there surveying that he run across certain lines there to get that line, and when he struck this place, always considered that was the line. There were some elm trees, as near as I can remem-

ber, on the bank of the gully, right on the bank of the gully almost, that had surveying marks on it; if I remember right, it·was cuts and a cross on this little elm,·and further out, through the timber, there , was small pine trees, some scattering oaks, and you could see the hacks along there, and that is what we were guided by in wood chopping.

"I know Mr. P. G. Omohundro. I have seen him in that vicinity; saw him there a couple of months ago, doing some surveying down there. I did not point out to him any marks or lines of any surveys of land; I found him on the line of the Benjamin Barrow tract, lower end of it, on the north line; this line upon which Omohundro was at the time I saw him is the north line of the Benjamin Barrow survey about which I have been testifying. It was·the line I spoke of as having been marked through the timber there, and known by reputation in that neighborhood as the north line of the Benjamin Barrow, where the fence is placed today. I spoke about Mr. J. J Gillespie being out there doing some surveying, and that I left him on the bayou; Mr. Omohundro was virtually in the same place that Mr. Gillespie was at the time I saw Mr. Gillespie."

Mr. Omohundro testified:

"I went to that point (the northwest corner of the Armstrong survey), and picked up my work at that point on the bank of Cedar bayou, on the west side of it, on the line which, produced west, would be a prolongation of the Armstrong, and I measured that distance and ran that line which has the correct bearing as given in the Benjamin Barrow notes, S. 80½° W.; all these latter surveys ran at that, apparently. Mr. Sjolander was with me at the time, and I asked him if he recognized that as the Barrow line, and he said he knew it, and measurements as made from there are as shown on this map here as the north line of the Benjamin Barrow."

In addition to this, it was shown that many years ago the then owner of the Ritchie survey sold a tract of land out of the southern portion of said survey which was described as beginning on the north line of the Barrow, and that the purchaser of said tract in fencing it recognized ·the line described by 'the witnesses Sjolander and Omohundro as the north line of the Barrow.

I do not think it can be held that this evidence does not raise an issue of fact as to the actual location of the Barrow north line at a place other than along the south line of the Bloodgood. The testimony as to the identify of the marked line before mentioned as the north line of the Barrow may be weakened by the fact that the fence placed on said line in 1878 or 1879 was erected by parties who at that time owned only the south half of the Barrow survey. This fact, it may be conceded, tends to show that this marked line was a division line between the north and south halves of the survey, but it does not conclusively show that Sjolander was mistaken in his statement that this line was known and recognized as the north line of the survey. Especially is this true when there is no evidence of any other line recognized in the community or claimed by the owners of the Barrow to be the north line of said survey. If the Barrow north line is located as, claimed by appellee, there is abundant, if not conclusive, evidence to sustain the finding of the jury that Gillespie, in locating the Smith and Ritchie surveys, did not extend the lines of said surveys further than 1,600 varas north of said Barrow line, and the stake which he calls for at the northeast corner of the Smith was not, as he stated in his field notes, the southeast corner of the George Ellis survey. Gillespie has been dead a number of years, but the field notes of the Mings survey, which, as we have before stated, was located by him 12 years after he had located the Smith and Ritchie, are entitled to as much consideration as the testimony of the living witness, and, according to these field notes, his statement in the field notes of the Smith, that its northeast corner was the southeast corner of the Ellis, was a mistake. It cannot be presumed that after, by actual survey of the land, he located the Smith and Ritchie north lines along the south line of the Ellis, he would locate the Mings survey upon the same ground on which he located the former surveys. The south line of the Ellis is not a marked line, and, knowing as he did the distance from the Bloodgood southwest corner to the southeast corner of the Ellis, if he started on the north line of the Barrow as fixed by appellee's witnesses 1,500 varas west from Cedar bayou, which, according to the calls in the field notes of the Barrow and the Bloodgood, he supposed was the southwest corner of the Bloodgood, his mistaken calls in the field notes of the Smith for the west line of the Bloodgood and the southeast corner of the Smith are readily accounted for, neither of said lines being marked.

I think the majority of the court have misinterpreted and misapplied the well-established rule in regard to the admission of parol evidence to contradict the calls of the field notes of surveys of land.

It is manifest that the evidence as to the actual location of the lines.in question was not fully developed upon the former trial, and, while the judgment of the trial court might be affirmed, I think it should be reversed, and the cause remanded for a new trial.