**COCKRELL v. WORK, County Surveyor, et al.**

No. 10204.

Court of Civil Appeals of Texas. Galveston.

April 16, 1936.

Rehearing Denied May 14, 1936.

Opinion on Motion for Rehearing May 21, 1936.

W. D. Gordon and E. E. Easterling, both of Beaumont, C. A. Teagle, of Houston, and Levy & Levy and J. G. Howard, all of Galveston, for appellant.

Andrews, Kelley, Kurth & Campbell, Baker, Botts, Andrews & Wharton, H. F. Montgomery, and Huggins, Kayser & Liddell, all of Houston, Llewellyn & Dougharty and E. B. Pickett, Jr., all of Liberty, A. W. Marshall, of Anahuac, T. L. Foster, of Dallas, and Joiner Cartwright, Orgain, Carroll & Bell, and Will E. Orgain, all of Beaumont, for appellees other than W. O. Work.

Patillo Higgins, of San Antonio, pro se.

Hull & Oliver, of San Antonio, for appellees Annie and Patillo Higgins.

LANE, Justice.

At a former day of the present term of this court, all members of the court sitting, we prepared and caused to be filed an opinion in this cause affirming the judgment of the trial court. After such preparation and filing, it was made known to us for the first time, by motion of appellant, that Associate Justice GRAVES was disqualified to sit in the cause. Upon such disclosure, the majority of this court upon reconsideration of the cause have and do hereby set aside said opinion, and upon such reconsideration have reached the conclusion that the judgment of the trial court should be affirmed, and so concluding we here render the majority opinion as follows:

This is a proceeding instituted by E. Cockrell in the district court of Chambers county against W. O. Work in his capacity as surveyor of Chambers county, Tex., praying for an order of the court commanding said Work as such surveyor to make and return to the General Land Office of Texas his official survey showing a tract or body of vacant, unsurveyed school land, described in the plaintiff's petition. Plaintiff also prays that a judgment be entered by the court fixing and establishing the boundaries of the land as set forth in the plaintiff's petition.

Plaintiff alleged that he had filed his application with the Commissioner of the General Land Office of Texas in manner and as required by law, setting up his desire to purchase a portion of the unsurveyed land belonging to the school fund of Texas, "and asking to buy the same in accordance with the subscription and designation hereafter more fully set forth." Plaintiff, continuing, further alleged as follows:

"That upon consideration of said application the said Commissioner of the General Land Office of Texas has declined to recognize the existence of the area sought to be purchased by the plaintiff as public school land, and has refused to authorize the survey to be made. That said ruling of the said Land Commissioner is based upon want of sufficient information to satisfy the Commissioner of the existence of said vacancy sought to be purchased, and renders it necessary to establish in this proceeding the boundaries of the titled and patented lands abutting upon and adjacent to the said area sought to be declared as vacant and purchased as such by the plaintiff.

"That the said defendant herein is official surveyor of said Chambers County, and is the proper person required by law to make out and certify to said vacancy when established, and this suit is instituted for the purpose of fixing and establishing the boundaries of said surveys in their relation to the unsurveyed school land for which plaintiff has applied to purchase.

"That the land above referred to is vacant, unsurveyed school land, and is described as follows, to-wit:

"Said land is situated in Chambers and Harris Counties, about twelve miles course about North 70 deg. W. from Anahuac, the County Seat of Chambers County, on the waters of Cedar Bayou, tributary to Trinity Bay, and is more particularly described and bounded as follows."

Such allegations are then followed by a description of the land of which a survey is prayed for, and for which judgment is prayed for by plaintiff.

Further pleading, plaintiff alleges "that said vacancy so existing is determined primarily by the true location of the north boundary line of the William Bloodgood headright league survey, which survey, made by Isaac Hughes, official surveyor, is described substantially in the title field notes as follows."

At this point field notes are set out which plaintiff alleges are *substantially* the

same as those of the title field notes of the Bloodgood survey.

Plaintiff's prayer is that a judgment and decree be entered fixing and establishing the boundaries as set out in plaintiff's petition so as to establish the existence of said land as unsurveyed public land, and a description thereof by metes and bounds, and for an order commanding the defendant Work, as county surveyor, to make and return to the General Land Office his official survey, showing the vacancy alleged by the plaintiff.

Defendant W. O. Work, surveyor, answered, alleging that he is informed and believes that the land described in the plaintiff's petition and claimed by plaintiff to be unsurveyed public school land is now being claimed by more than one hundred parties, the names of whom are set out in said answer. Defendant Work impleaded each and all of such claimants as defendants, requiring them to set up their respective claims to the land, or any interest therein.

The impleaded defendants answered, denying the existence of the vacancy, and set up their respective claims to an interest in the land in controversy. Some of them plead general demurrers and certain special exceptions, the substance of which is not necessary to be here stated, as the court overruled all of them and no exceptions were taken to such rulings.

The controlling issue presented by the pleadings and the evidence is the true location of the north lines of the William Bloodgood league and the William Bloodgood augmentation. The league of land was granted to William Bloodgood by the Mexican government on August 10, 1824. The land so granted was described by the original field notes as follows:

"Situated on Cedar Creek, five leagues, more or less, above its mouth east side of San Jacinto Bay; and from a point where a landmark was set in the prairie on the east side of said creek, the surveyor commenced. Thence he measured 5000 varas South 9½ deg. East where another landmark was set. Thence South 80½ deg. West 5000 varas, crossing Cedar Creek, where set a landmark. Thence North 9½ deg. West 5000 varas where set another landmark at a distance of 1 vara from an elm North 50 deg. West and 6 varas from an oak South 25 deg. West, both marked W. B. Thence North 80½ deg. East 5000 varas crossing said

creek again to where the first line began, comprising within all these lines the quantity of one league and being contiguous on all sides with vacant lands of the Nation."

It is shown by the undisputed evidence that the grant of the William Bloodgood league was the oldest survey in that territory except the Christian Smith league lying to the south of the Bloodgood, which was granted and surveyed in July, 1824.

On February 9, 1825, some six months after the league grant to Bloodgood was made, Isaac Hughes, the surveyor who made the original field notes appearing in the grant, made and caused to be placed of record in the Land Office of Texas field notes of the grant reading as follows:

"1 Lea., Wm. Bloodgood.

"Situated on Cedar Bayou East of the San Jacinto Bay.

"Beginning on the East side of Cedar Bayou about 15 miles above its mouth, a post in prairy.

"Thence S. 9½ E. 5000 to the S. E. Cor. a post and mound in prairy.

"Thence S. 80½ W. at 3000 timber, at 3500 Cedar Bayou 30 varas wide at 4200 prairy to the S. W. Cor. a Post.

"Thence N. 9½ W. 5000 to the N. W. Cor. a Post from which an Elm mk. W. B. bears N. 50 W. 100 a Water Oak mk. W. B. S. 25 S. Cor.

"Thence N. 80½ E. 5000 at 400 Cedar Bayou at 600 same, 1200 same, at 2500 is prairy, 5000 to the beginning.

"I. Hughes, Sur."

To show the true location of the original northwest corner of the William Bloodgood league and its north lines thereof, the plaintiff Cockrell, appellant here, sought to prove that said original northwest corner as called for in the original league grant to William Bloodgood in 1824 was at a point near where he claims two marked trees stood in 1824, one an oak and the other an elm, both marked "W. B."; plaintiff claiming that said two trees were the two trees called for in the original field notes of the grant made in 1824, about 110 years prior to the date of the trial of this case, said trees also being called for by Isaac Hughes in the English field notes filed by him in 1825, neither of which could be found at the point claimed by plaintiff Cockrell to be the northwest corner of the Bloodgood league.

It will be observed from the foregoing statement that the original field notes, upon which the Bloodgood league was granted, were made by Isaac Hughes in 1824, and that the same surveyor made other field notes of the league in 1825, and that the two are not identical in this, the field notes found in the grant do not, when running the north line eastward to the beginning point, give the several distances at which the surveyor crossed Cedar creek, while those made in 1825 state the several distances at which he reached Cedar creek; the last call in the latter being as follows: "Thence N. 80½ E. 5000 at 400 Cedar Bayou at 600 same, 1200 same, at 2500 is prairy, 5000 to the beginning."

The statement of facts covers 1,617 pages and some 150 or more exhibits; therefore, to set out all the evidence of the parties upon which they rely for proof of their respective contentions as to the true location of the northwest corner and the north line of the Bloodgood League would be an almost impossible undertaking and incur much unnecessary labor. However, as the controlling issue in this case is as to where such true location is situated, we shall undertake to state only so much of the evidence as we think justified the court's charge to the jury and supports the answer of the jury to the one special issue submitted.

The field notes appearing in the Bloodgood league grant and those made by Hughes in 1825, hereinbefore set out, were introduced in evidence.

Witness Faber, a state surveyor who had been sent by the Attorney General to ascertain as to whether the vacancy claimed by the plaintiff existed, testified that he began his survey of the Bloodgood league at a point where he stated he "tied into an iron pipe, a one inch iron pipe, pointed out to him by Mr. Higgins and Mr. John Smith as the *northeast corner* of the William Bloodgood" (league).

Testifying further, he said:

"I also tied into an iron pipe Mr. Higgins pointed out as the northwest corner of the William Hodges League. And I made ties to all fence lines across this line I ran out.

"After I had completed that first run around this area involved in this investigation, I ran additional lines, cross lines, an additional circuit that would pick up other points that might assist me in locating these land lines. From the Johnson corner I ran a survey up to what is known as the inner northeast corner of the Ellis League, and ran out what was apparently the south line of the Wm. D. Smith Quarter League to the one inch pipe pointed out to me by Mr. Higgins as the northeast corner of the William Bloodgood League. From the southwest corner of the Ernest Cockrell File, which is located on the ground by Mr. Work, I ran out the south line of the Ernest Cockrell File and found it to meet the call of the original field notes of the north line of the William Bloodgood League, provided that the northwest corner of the League were placed 400 varas from the first crossing of Cedar Bayou; and that would make the second crossing at 600 varas, and the third crossing at 1200 varas.

"I meandered Cedar Bayou from the north line of the Christian Smith, this line here (indicating) up to the north line of the Wm. D. Smith Quarter League and south line of the Hannah Nash League, and found that at no other point in that area could a crossing be found similar to what had been located by Mr. Work, County Surveyor of Chambers County.

"I also ran a line up from what was pointed out to me as the southwest corner of the William Bloodgood League 5,000 varas at right angles to the Benjamin Barrow League, and at 5,000 varas from the north line of the Benjamin Barrow League I turned a right angle across Cedar Bayou to determine the distance that point would be from the crossing on Cedar Bayou. I found the first crossing to be 738 varas, and I found the next crossing to be 1076 varas, and the next crossing 1586 varas. Those crossings did not correspond to the original field notes.

"I also extended that line, the 5000 varas line from the Benjamin Barrow League, I extended it up to what is known as the Omohundro Corner, and found the distance from the Omohundro Corner to the north line of the Benjamin Barrow Survey to be 5,705 varas; and from the Omohundro Corner I ran a line at right angles to the west line to determine the crossings on Cedar Bayou, on a line that runs from the Omohundro Corner parallel to the south line of the Wm. D. Smith League.

. "I found the first crossing to be 309 varas from that corner, and the second crossing to be 734 varas from that corner, and found the third crossing to be 783 varas. That does not meet the original field note calls for the north line of the Bloodgood."

This witness based his conclusions largely upon what others pointed out to him as corners of the Bloodgood league and the location of several junior surveys contiguous to the Bloodgood league. He assumed that as he found in the description of the Bloodgood augmentation a cedar stump called for as its northwest corner and the field notes of said augmentation call for the southwest corner of the Bloodgood league, such corner of the league was established at that point, though no call was made in the league field notes for any stump or any tree. He testified to many things which, if undisputed by evidence introduced by the defendants, would have called for a finding that the south line of the Bloodgood league and its southwest corner was at the place and point he placed them by his survey. But we find in the statement of facts much evidence which we will later detail which, if true, would overthrow the force of the testimony of the witness Faber and all other evidence tending to support it.

■ The plaintiff, to prove the existence of the vacancy he seeks to establish, relies upon the testimony of the witness Faber, supported by the testimony of the surveyor Work and some others, who testified that the northwest corner and north line was generally understood by those in the vicinity to be where Faber's map shows them to be, together with the map he drew showing where he placed the northwest corner of the Bloodgood league, and hence its north line. So if the preponderance of the evidence as a whole does not support Faber's location of the northwest corner and north line of said league, he is not entitled to a recovery in this suit, as the burden was upon him of proving that the vacancy claimed by him existed.

Surveyor Work, witness for the plaintiff, among other things, testified as follows: "That when he first went to the point that he has marked and located as the northwest corner of the Bloodgood League there was no mark of any kind there and the witness placed a ⅞ths-inch drive shaft and 2-inch iron pipe there; that

the Hughes field notes in the original title called for the Bloodgood to be in a square; that his location does not make it so; that at the northeast corner of the Bloodgood, as he locates it, when he was first there, there was no stake or other mark locating it there. As witness locates the Bloodgood League it does not touch the Griffith League; that the south line of the Griffith is one hundred fifty varas north of witness' location of the north line of the Bloodgood."

Again: "That he had never heard of anybody seeing any W. B. trees at the northwest corner of the league as located by appellant, and he did not find nor did he ever see at the northwest corner as located by him any evidence of the existence of any old oak or elm tree, but he did see evidence of same up at the W. B. corner, shown on his map as the Omohundro corner."

It is true that the evidence offered by the opposing parties with reference to the true location of the south line of the Bloodgood league is conflicting, and in such case the question of where such line is in fact located is a fact left to the determination of the trial court.

The original title and the field notes as made by surveyor Hughes, hereinbefore set out, each called for two trees at the northwest corner of the Bloodgood league, one an elm and the other an oak, both marked "W. B."; the specific call being: "The northwest corner where set another landmark at a distance of one vara from an Elm N. 50 deg. West and 6 varas from an Oak S 25 deg. West, both marked 'W. B.'"

P. G. Omohundro, a surveyor, who died in 1930, in 1912 made a survey in the general territory involved. The original field book as kept by Mr. Omohundro in his own handwriting was produced and identified. Such field notes are as follows:

"April 14, 1912.

"Went to the accepted N. W. cor. of Blgood Lgue. old oak (down) with old blocked out blaze fr. wh. W. Oak S. 40½ W. 12½ vrs. one X cut out another below, tree abt. 24".

"Thence N. 80½ W. 216 vrs. to pt. Searched for the original N. W. Cor. of Bloodgood. Found it at N. 76½ E. 117 vrs. from 216 pt. Set stake from wh. an elm 19" di. with very old mks, brs. N. 50 W. 1 vr. and old water O. oak 25" diam.

with letters 'W. B.' mks. brs. S. 25 W. 6 vrs. The elm is broken off & snag stands 5' feet high. The oak is also broken off & stands 7½' high. Bark of oak facing corner fallen off & a section extending from top to ground rotted out. This snag is but a shell, thoroughly rotten from heart to approx ½" rim. axe marks are plain to practiced eye. Elm is partly sound, only broken off within 4 or 5 years past. Body of elm lies 30 deg. to south east."

J. S. Boyles, now and for more than twenty years county surveyor of Harris county, testified that he was well acquainted with P. G. Omohundro; that in 1918 he went with Omohundro to the recognized inner corner of the George Ellis league and the northwest corner of the Bloodgood, a point to which he had been several times before, and made a search for the W. B. trees, which Omohundro advised that he had theretofore seen; that at that time they had a photostat copy of the Bloodgood field notes; that although Mr. Omohundro had theretofore seen the trees, the witness found them on that trip and showed them to Omohundro, instead of Omohundro finding the trees and showing them to witness. "It was just at noon and I ran on this old snag marked 'W. B.,' and called Omohundro over, and he said, yes, that was the tree. * * * That was one of the witness trees for the northwest corner of the Bloodgood League. And we also found an elm lying on the ground, all punk, that was also marked 'W. B.'; and the relation of the elm with the marks and the relation of the oak snag with the marks were as they should be reflected by the trees called for at the northwest corner of the Bloodgood, in the Bloodgood field notes, which I had with me." Omohundro said he had seen the trees in 1912.

The witness further testified: "I marked two trees there 'A' over 'X' and took the course and distance to them at each place. The accepted northwest corner was southeast and was also marked."

H. O. Compton, a surveyor, testified that he was there first in 1927, and the old mound where the oak tree grew was still there, and a few slabs of the oak six or eight feet long and three or four inches wide from the old oak tree lay about on the ground. That to the northwest at the distance called for there was a hole with old roots, but they were so old and decayed that he could not determine the kind of tree. The location of the hole was one

vara from where the W. B. corner is. That in 1928 Omohundro pointed out to him the same spot as the place where the remains of the old oak was in 1912, the same being then standing as a mere shell upon which Omohundro could trace the letters "W. B." He also stated that the other stump hole was at the place of the elm snag, which was in 1912 seven or eight feet high with "W. B." on it. The fence corner between the Bloodgood and Ellis is at this point.

J. E. Bloom testified that he now lives on the Ellis league and owns land both in the Ellis and the Bloodgood leagues; that he was first at the W. B. corner in 1894. (The W. B. corner is shown on the Compton map at the point "W. B."; on the Faber and Work maps it is shown at the point marked "Omohundro Corner.") Bloom testified that in 1894 there was within a few steps of the present W. B. corner an old water oak tree about twenty-four inches in diameter with "W. B." marked on it. At that time the witness was looking for the corner of the George Ellis league (a common corner with the Bloodgood). A man named Tom May was with him. The witness stated that the tree was deteriorating; that it had commenced to decay and the limbs had commenced to die on it at that time; that his present home is about a mile from the W. B. corner; that during the same winter he had first seen the tree in 1894 he again saw the tree, but after that he left the country for about twenty years; that he had lately been back to the corner and the tree is not there now.

On cross-examination he testified that the branches of the tree had commenced to deteriorate in 1894 and it was starting to die.

Amos Jennische testified that he now lives in Harris county, but for a long time lived in Chambers county somewhere near the middle of the Bloodgood league; that his home was about one-quarter of a mile from the bayou; that he was acquainted with the location of both the north and south lines of the William Bloodgood as recognized on the ground; that about thirty-seven years before witness was with a surveyor named Luttrell when he surveyed the Bloodgood league for a man named Jackson; that Luttrell started his survey from the northwest corner of the Bloodgood league; that he started his survey from a point west of

what is known as the Ellis branch and from near the tree with "W. B." on it; that the witness had seen the tree with "W. B." on it before that time; that in running the north line Luttrell went right at the mouth of Ellis branch and near where two big cypress trees were, one of which was marked "X"; that Luttrell started at the northwest corner and came out at the northeast corner, and then went on down to the southeast corner, and then turned in toward the bayou; that the witness' father, who is now dead, was with Luttrell at the time; that Luttrell is now dead; that the northeast corner of the Bloodgood league to which Luttrell arrived was marked with a cedar stake and it was the corner of the Joe Fisher land, John Smith land, and the Ben Fisher land.

On cross-examination, the witness testified that he remembered the W. B. tree and the cypress tree with the "X" marked on it; that Mr. Frost had surveyed in that territory before; that Luttrell went up to the northeast corner (place near the W. B. tree), and he called it the northwest corner of the league; that the witness had seen the W. B. tree before while chopping wood; it had been pointed out to him. Mr. Luttrell placed his instrument somewhere close to that tree, some ten or fifteen feet from it.

Jerry Wilburn testified that he was sixty-five years old; moved upon the Henry Griffith league when he was one year old; that as far back as he could remember there was a cedar stob for the northwest corner of the Hodges, which was in a flag pond there; that the south line of the Griffith league was right in front of their house; that he helped carry a chain in a survey being made of the Bloodgood league by one John Frost, who is now dead; that it was about thirty-eight years before the time the witness testified; that his brother, Zack, assisted in making the survey; that they went to a point west of Cedar bayou to begin. They started from a tree, a good big tree, with W. B. on it; that Frost had the field notes of the Bloodgood league with him. M. Frost went over there and found the corner that he said he was looking for; that the witness saw the tree; that it had W. B. marked on it; that it was a pin oak or red oak; that the surveyor took a knife and knocked the rough off the tree and the mark was "plumb plain"; that it was an old mark; that according to his recollection the tree was about eighteen inches or larger. Frost ran the north line back to the hill and stopped at a cedar stob.

Zack Wilburn testified that he lives in Harris county near Cedar bayou; had lived in Chambers county; that his father was B. F. Wilburn, who is now dead; that he is sixty-two years old; and that in 1895 he was with Frost, who was surveying the Bloodgood league. Referring to Frost, the witness said: "Well, he had field notes, and he was supposed to start at the northwest corner and he went there and couldn't find it. He said he placed a mound over that and knew where the corner was on the hill, and he went back out there and chained the line back over to this corner (meaning the northwest corner). He had field notes, and he went the distance of the line." Three fences joined at the northeast corner, the Smith fence and the two Fisher fences. The witness was familiar with that on the ground. Frost traced the line back from that corner to the northwest corner. He found a tree marked W. B. about eighteen inches in diameter and about two hundred fifty yards west of Cedar bayou. When Frost found that tree he was satisfied with that being the corner. After finding that corner, he ran the line over again back to the corner on the hill and reached the point of beginning; then he went back to the northwest corner and chained the west line of the Bloodgood down to the southwest corner. He ran the south line and thence up the east line and came out right there about the corner on the hill, which was marked by a stake where the fences cornered.

H. O. Compton, county surveyor of Liberty county, testified that he had done much surveying in the territory where the Bloodgood and the surrounding lands are located in Chambers county. He corroborates the testimony of other witnesses for appellees as to where the north line of the Bloodgood league is located. He testified that he went to the point where Surveyor Boyles said he found the trees marked "WB"; that he found an oak tree at that point marked "AX"; that in 1927 he found the old mound where the oak tree grew and there were a few slabs, some six or eight feet long, on the ground, and also a hole with tree roots therein which was one vara from the "WB" corner; that in 1928 Omohundro pointed out to him the same spot where the old oak was in 1912, then standing as a mere shell,

and the stump hole where an elm snag was in 1912, the time Omohundro was first at that place. He testified that at the place where the "WB" trees were said to be when marked there is timber over 100 years old; that there is no old timber at the point claimed by the plaintiff as the northwest corner of the Bloodgood league.

J. E. Bloom testified that he was in 1894 at the point in Harris county, west of Cedar bayou, known as the inner northeast of. the George Ellis league and the northwest corner of the Bloodgood league, and there was pointed out to him an oak tree marked "W. B.," which tree at that time was deteriorating and dying; that he was then the owner of land in the Ellis league and that he was looking for the corner; that the corner was where the fence corner is now, but the tree is not there now.

Jerry Wilburn, sixty-five years old, who lived on the Griffith league since he was one year old, testified he had helped Surveyor Frost make a survey of the north line of the Bloodgood league about thirty-eight years ago; that at that time Frost found what he said was the northwest corner of the Bloodgood League which was marked by an oak with "W. B." on it; that it was a very old mark and that the surveyor ran back from that point east, the distance called for in the Bloodgood field notes, and arrived within about five feet of the cedar stob then recognized in the community to be the northeast corner of the Bloodgood; that in the effort to locate the "W. B." tree, Frost had run a line from the recognized northeast corner.

Zack Wilburn testified substantially to the same effect. He stated that Surveyor Frost had the field notes of the Bloodgood league with him and had gone to the vicinity of the northwest corner but was unable to find the "W. B." tree, and thereupon he came back to the northeast corner, as marked by a stob and generally recognized to be its northeast corner of the league, and chained west along course and distance called for as the north line and found the northwest corner evidenced by the tree with "W. B." marked thereon; that he took his axe and cut off the outside bark and "W. B." was easily recognizable; that the surveyor then ran back east to prove the northeast corner.

The witness further testified that close to the oak tree there was an old elm tree, also with marks "W. B." on it; that on the line run between the two points there were marks on trees both east and west of the bayou.

· O. Z. Smith testified that more than twenty-five years ago he saw the old oak tree marked "W. B." at the northwest corner of the· league and was told that it marked the northwest corner of the Bloodgood league; that it was a big tree; that the witness could not name the exact time, but could safely say it was more than twenty-five years ago. The witness further testified that he knew the two cypress trees on the bayou and more than thirty years ago his father had told him they were near the north. line of the Bloodgood league. The cypress trees are standing now.

Julian Barber, forty-four years of age, the son of E. W. Barber, testified that his father was an invalid and unable to attend court; that witness was born on the Henry Griffith league; that the vacancy asserted by appellant includes land owned by him on which his home is situated; that he knew of the bench mark at the point claimed by Surveyor Faber to be the northeast corner of the Bloodgood league; that such point is roughly about eight hundred yards (south) from the corner which had always been recognized as the northeast corner of the Bloodgood league.

Surveyor Faber testified that the point asserted by him to be the northeast corner of the Bloodgood league is three hundred varas east of the Ellis east line; that there are no old trees at such point. He admitted that on the north line of the Bloodgood league as located by him and where same passed through the timber that he found no old marks or any marks more than ten or fifteen years old. He stated that running the line east from the W. B. corner, called by the witness the "Omohundro Corner," he found marked trees for the entire distance of the line through the woods. He stated in effect that though the decision of. the Court of Civil Appeals in Wilson v. Giraud, 234 S.W. 110, made the east line of the Ashbell Smith and the west line of the Bloodgood common lines, his map did not have it that way; that according to his map there was vacant school land between the two lines.

Appellant's witness Work, defendant in the case, in addition to his testimony hereinbefore stated, testified: That in 1923 at the place known as the W. B. corner he found an oak stump and an elm stump,

which are not there to-day; that he had been county surveyor of Chambers county since 1918 or 1919, and that his location of the lines of the Bloodgood league are not in accord with the same as generally recognized; that the north line of the Cockrell file is where the Bloodgood northwest corner had been recognized to be as far back as the witness knew; that Patrick, who surveyed the William D. Smith one-quarter league, was the same man who surveyed the 1,245 acres sold by Bloodgood to Smith in 1834, a year before Patrick located for the same William D. Smith the quarter league joining it on the north; that the upper east line of the Ellis called for the same meanders of the bayou as the west line of the Smith; that just north of the south line of the W. B. Smith as placed by witness he found a marked line, and some of the marks thereon were as much as fifty years old; that he cut into a tree in that neighborhood and found it to be one hundred and eight years old; that he cut into it for the purpose of determining its age; that he found no old marks through the timber on the south line of the Cockrell file, which is the north line of the Bloodgood as claimed by appellant. Witness did not recall the marked cypress trees near the mouth of Ellis Gully; that the witness knows where the Bloom land is in the northwest corner of the Bloodgood as same is claimed to be by appellees and in the northwest part of the Cockrell file as claimed by appellant; that in 1919, he went to what he calls the "Omohundro Corner" (W. B. corner), and there were then some old stumps there, some seven feet high. He had heard that Omohundro had said that he had seen the W. B. on these trees; that the old snag was about eight varas from the stake marking the northwest corner of the Bloom land; that at this time the remnants of the old oak tree were there, but less than in 1919; and saw the old hole it came out of and it checks up very close on the course from the inner corner of the Ellis; that the northeast corner of the Bloodgood league as appellees claim it to be has been so recognized as long as the witness has had any information about that territory; that very old men told the witness that was the northeast corner of the Bloodgood; that it was 986 varas from the William D. Smith southwest corner on the east side of the bayou to the Ellis inner corner; that the bayou is about thirty-six varas wide; that Patrick called for the distance for the inner southeast corner of the Ellis, which began on the west side of the bayou to the Bloodgood northwest corner, being the Ellis inner corner, to be 950 varas; that the stake at the inner corner of the Ellis is a very old stake; that his present location of the northwest corner of the Bloodgood is south 10 deg. 37' east 790 varas and North 79 deg. 19' east 305 varas from the old recognized northwest corner of the Bloodgood; that the inner corner was marked by an old stake the first time he ever saw it.

While there is much evidence shown in the voluminous statement of facts, as well as that stated in the briefs of the parties, not stated in the foregoing statement, we think the statement which we have made sufficiently justified the submission of the case to the jury as it was submitted, the verdict of the jury, and the conclusions we have reached which we shall hereinafter state.

The cause was tried before a jury, to which the court submitted but one special issue, which is as follows: "Do you find from a preponderance of the evidence that the original northwest corner, as called for in the original league grant to William Bloodgood, and identified therein, by the two witness trees, one an oak and the other an elm, both marked 'WB' is located on the ground at the point claimed by the plaintiff Cockrell, and identified, 'B M I F,' on the map presented by the plaintiff's witness Faber?" The jury answered such question: "No."

Upon the evidence and the verdict of the jury the court rendered judgment that the land referred to in plaintiff's petition is not unsurveyed school land but is patented land, and that plaintiff's prayer for writ of mandamus against defendant W. O. Work, in his capacity as surveyor of Chambers county, is denied, and that the plaintiff take nothing by this suit against W. O. Work nor against the other defendants made parties with defendant Work, and that said defendants go hence without day and recover their costs of plaintiff, and that A. W. Marshall, attorney ad litem, appointed to represent the nonresident defendants cited by publication, be allowed the sum of $1,000 as a fee for representing said defendants against plaintiff as costs in this suit, and that all defendants not herein specially disposed of are dismissed.

From such judgment plaintiff Cockrell has appealed.

After the close of the evidence and before the case was submitted to the jury, counsel for the plaintiff presented to the court a request for an instructed verdict for plaintiff. Such requested charge, when copied into the plaintiff's brief, covers nine pages of closely printed matter. Such charge, in effect, requests the court to instruct the jury that every issue raised by the pleadings of the parties was proven in favor of the plaintiff by the undisputed evidence, wherefore they should return a general verdict for the plaintiff. The court refused the requested charge and appellant now assigns such refusal as reversible error in the following language: "There being no dispute in the evidence that both the north boundary line of the Bloodgood League and its south boundary line, were fixed and established on the ground, as claimed by the plaintiff below, it was error in the court to refuse to direct a verdict for the plaintiff as requested in a special charge to that effect."

■ We overrule such assignment. We have stated above evidence which we think compelled the court to refuse the charge, the refusal of which is assigned as error. Passing calls for Cedar bayou, relied upon by appellant as indisputably showing that the north line of the Bloodgood league was at the point claimed by him, are not in law calls for natural monuments, but in law and logic mere distance calls, not location calls, and have not as high a dignity as calls for course and distance. Jones v. Andrews, 72 Tex. 5, 9 S.W. 170, 174; Runkle v. Smith (Tex.Civ.App.) 133 S.W. 745, 746; Southwestern Settlement, etc., v. Stanburg (Tex.Civ.App.) 248 S.W. 108. The location of the point where the W. B. trees, marked by Surveyor Hughes in 1824, as the northwest corner of the Bloodgood league, was testified to as being at the point claimed to be the northwest corner of the Bloodgood league by appellees. Numerous witnesses testified that parts of said W. B. trees were standing as late as 1912, and that upon such parts the W. B. marks were at such time visible.

In Jones v. Andrews, supra, it is said: "Distances called for between corners to creeks or roads, unless specially designated in such manner as to show the intention to make them locative, are not such, and will not ordinarily have precedence over a call for course and distance."

In Runkle v. Smith (Tex.Civ.App.) 133 S.W. 745, 746, the court, citing Jones v. Andrews, supra, said that a distance call for a creek crossing is a description and not a location call, and same is not of as high dignity as a call for course and distance.

■ We think the overwhelming evidence in the present case compelled the court to refuse the requested charge referred to, and supports the answer of the jury to the issue submitted. It is the well-established rule in this state that the natural objects called for in the field notes of a survey, such as the W. B. trees in the present case as at the point of the northwest corner of the Bloodgood league, are of controlling importance in locating it on the ground. Southwestern Settlement & Dev. Co. v. Stanburg (Tex.Civ.App.) 248 S.W. 108.

Notwithstanding the answer of the jury to the issue submitted, appellant requested the court to render judgment for him, in that the undisputed evidence showed that he was entitled to such judgment, and therefore the court erred in refusing such request.

There is, we think, no merit in such contention. What we have said in the discussion of the first assignment presents sufficient reason for the overruling of the contention here mentioned, and we overrule such contention without further discussion.

■ The court, over objection of appellant, admitted in evidence the field notes of the W. D. Smith and the Ellis surveys which call for the north line of the Bloodgood league as one of their boundaries, and in so admitting the evidence of the field notes of a survey made in 1894 by Surveyor Patrick of a purported part of the Bloodgood abutting on the north line of said league. Appellant by his assignments 3 and 4 contends that the admission of such evidence is reversible error.

We overrule such contention. It is shown by undisputed evidence that Surveyor Patrick, who located the Smith and Ellis surveys a short time after the Bloodgood had been located, had theretofore made surveys in the Bloodgood league. It is apparent that in making such surveys it was necessary that he locate on the ground the north line and northwest corner of the Bloodgood league. He was at the time of such surveys, no doubt, familiar with the north line and northwest corner of the Bloodgood league, and his call for such line and corner as being at the place

designated cannot be attributed to error or mistake. We do not think the admission of the evidence objected to was error.

█ The court, over objection of appellant, permitted several witnesses to testify that they had seen the two W. B. trees at a point generally known as the northeast corner of the Ellis and the northwest corner of the Bloodgood league, and that such trees were at the point claimed by appellees as the northwest corner of the Bloodgood league. Appellant contends that the admission of such testimony constitutes reversible error.

We overrule such contention. We think the testimony was clearly admissible.

█ J. W. Boyles, a surveyor, was permitted to testify over objection of appellant that in 1918 he and a surveyor named Omohundro, with whom he was well acquainted, were looking for the W. B. trees called for in the field notes of the Bloodgood league as its northwest corner, which Omohundro said he had seen in 1912 while surveying in that territory; that in a search for such trees he (Boyles) found them and showed them to Omohundro. Appellant insists that the admission of such evidence was error.

We overrule appellant's contention. The statement of the witness objected to was that he and Surveyor Omohundro, who was dead at the time of the trial of this cause, were on the ground looking for the W. B. trees; that Omohundro told witness he had seen the trees in 1912. The same facts, the admission of which is here complained of, were proven by entries made by Omohundro in his own handwriting in his own field notes under date of April 14, 1912, which evidence was already in the record, without objection, at the time witness Boyles testified. It has long been the rule in Texas that statements of third parties now dead, when pointing out boundaries, are admissible in evidence, Russell v. Hunnicutt, 70 Tex. 657, 8 S.W. 500, and the rule applies with equal force to statements made by persons, though now living, who are not available as witnesses. Griffith v. Sauls, 77 Tex. 630, 14 S.W. 230. It is also well determined that contents of a field book of a dead surveyor are admissible. Ayers v. Harris, 77 Tex. 108, 13 S.W. 768. However, in this case, there was no objection made to the admissibility of the surveyor's field book and the statement of the witness Boyles as to the statements of Omohundro was but repetition of that already evidenced by said field book.

█ It is also well settled that ancient boundaries may be proven by evidence of common reputation. Stover v. Gilbert, 112 Tex. 429, 433, 247 S.W. 841.

█ By his tenth assignment of error appellant contends that the court erred in permitting defendants to introduce in evidence the proceedings in the case of Wilson v. Giraud (Tex.Civ.App.) 234 S.W. 110 and Id., 111 Tex. 253, 231 S.W. 1074, namely: (a) The pleadings in the case; (b) the judgment of the trial court; (c) the opinion of the Court of Civil Appeals; (d) the certified questions to the Supreme Court; (e) the answers of the Supreme Court to certified questions.

We overrule such contention. The proceedings mentioned were proceedings having to do with the location of the Bloodgood league and its true boundaries and were admissible as evidence in the present suit, in which the location of the boundary lines of the Bloodgood league were matters of inquiry. The true location of said lines were matters determined in the proceedings referred to. Blaffer v. State (Tex. Civ.App.) 31 S.W.(2d) 172; Porter v. State (Tex.Civ.App.) 15 S.W.(2d) 191; 26 Texas Jurisprudence, pp. 46 and 307.

At page 47 of 26, Texas Jurisprudence, it is said that: "When the Supreme Court or a Court of Civil Appeals—if the Supreme Court has denied an application for a writ of error—has once given a definite effect to a specific writing or a particular fact situation—as when it determines the true construction of a will or the validity of a deed or a judgment or fixes the boundaries of a particular survey—such determination is binding and conclusive in all subsequent suits involving the same subject matter, whether the parties and the property are the same or not. This result is reached under and by virtue of the doctrine of stare decisis and not under the rule of res judicata."

And at page 307 of the same volume it is said: "A judgment of a court of final resort which determines the legal effect of a particular fact situation—such as a judgment fixing the boundaries of a survey—is final and conclusive in a subsequent suit wherein the same question arises, though neither the parties nor the subject matter are the same. Thus when the Supreme Court has determined the location of the

boundary line between the two sections in a suit involving one of them, its decision is conclusive in a subsequent suit involving the other section." Many cases are cited to support the rules stated.

Among the proceedings, the admission of which complaint is made, is found the opinion of the Court of Civil Appeals and the opinion of the Supreme Court in answer to certified questions. The Court of Civil Appeals found in the case of Wilson v. Giraud, referred to, that the northwest corner of the Bloodgood league was at the point where appellees in this case contend it was originally placed, and the Supreme Court, in answer to the certified questions, found that said northwest corner was at the point marked W. B. on the Compton map, same being the point contended for by appellees in this case, as the northwest corner of the Bloodgood league.

██ If, however, we are in error in holding that the admission in evidence of the proceedings in the suits mentioned for the reasons above stated was not error, we are of opinion that appellant is in no position to ask a reversal because of the admission of such opinions, in that Mr. Gordon invited such admission by asking his witness Faber to state the facts as to a gap of 707 varas west of the Wm. Bloodgood League, to which inquiry the witness answered: "The facts are, there is a gap that the Supreme Court recognized, a gap of 707 varas west of the Wm. Bloodgood League in which they created the L. A. Guerringer survey." And again, on cross-examination, he testified that the Supreme Court in their opinion referred to by him put the south line of the William Ritch and Ashbel Smith there (referring to point on map) ; that that decision in effect held that the east line of the Ashbel Smith was on the west line of the William Bloodgood; that by their decision the Supreme Court held that there is no school land vacancy on the west side of the Bloodgood league. Wherefore, by reason of the fact counsel for appellant had his witness Faber to give his interpretation of what the Supreme Court held, it was not error to permit appellees to introduce such opinions in evidence.

██ The court admitted in evidence over the objection of appellant the field notes upon which the Henry Griffith, the Wm. D. Smith, the George Ellis, and other surveys were located, all of them being junior surveys to the Wm. Bloodgood and their field notes calling for one of the lines of the Bloodgood as one of the lines of each of said junior surveys. The admission of such field notes in evidence is assigned as reversible error. We overrule the assignment. On page 226, § 73, vol. 7, Texas Jurisprudence, it is stated: "Under the statute relating to the admissibility of certified copies of records of surveys in the county surveyor's office, the field notes of a junior survey are admissible in evidence to show the location of the boundaries of a senior survey, even though they do not make reference to the earlier survey. Such field notes may also be admissible as declarations of deceased surveyors. They may be admitted to show the general location of the senior survey upon the ground, or to discover its true lines, or the location of objects called for in that survey."

We are further of opinion that if the admission of said decisions was error, such error would not be cause for reversal of the judgment, in that the great weight and preponderance of the evidence was so convincing that the north line of the Bloodgood league was not at or near the point or place contended for by appellant, as to render the admission of the decisions in question harmless.

We have examined and considered all of appellant's assignments not herein discussed, and overrule them as without merit.

Having reached the findings and conclusions above stated, it becomes our duty to affirm the judgment of the trial court, and it is accordingly so ordered.

Affirmed.

GRAVES, J., did not sit.

## On Appellant's Second Motion for Rehearing.

PLEASANTS, Chief Justice.

We have carefully considered this motion and all of the written arguments filed in its support, and adhere to the conclusion reached by us in passing upon and refusing appellant's first motion for rehearing. The docket entry dismissing the first motion was inadvertently made by the writer. The motion was fully considered, and corrections in the statement of facts made in our first opinion pointed out in the motion were made, and the motion refused.

The second motion for rehearing presents questions not raised in the first mo-

tion, but it seems to us that none of these questions can be properly decided in appellant's favor.

Appellant's theory of the case on the trial, and in the first motion for rehearing, was based on the contention that the calls for the three crossings of Cedar bayou as set out in the English field notes filed by the original surveyor Hughes, some six months after the grant was issued by the Mexican government, as a matter of law fix the location of the north line of the Bloodgood survey. As they appear in the original grant, these calls do not give the course of the bayou at the three crossings called for in the grant. A translation of the original Hughes field notes filed in the General Land Office, as before stated, after designating the northwest corner of the grant at a stake with the marked bearing trees set out in the grant, contains the following calls: "Thence N. 80½ E. 400 vs. crossed Cedar Bayou bearing S.E. 600 vs. the same, bearing N.E. 1200 vs. the same bearing S.E. 2500 vs. prairie; 5000 vs. the beginning."

We do not think the authorities cited by appellant sustain his contention that the calls for the course of Cedar bayou at the three crossings mentioned in the Hughes' translation of his original field notes conclusively fix the location of the north line of the survey. On the contrary, the well-established rule of decision in this state is that such calls for natural objects in a grant are only conclusive when there is no ambiguity in the description of the survey. This is the express holding in the case of Wilkins v. Clawson, 37 Tex.Civ.App. 162, 83 S.W. 732, 734. All that was held in that case was that the English translation of the field notes filed by the surveyor who made the survey should be considered as a part of the grant in determining the true location of the survey. The judgment in the case reversed the judgment of the trial court, holding that the calls in the grant controlled the location of the survey. In discussing this question the opinion says: "But we must not look alone to these field notes in determining the sufficiency of the description. The original English field notes and the plat or map prepared by the surveyor who located the survey are a part of the original title, and must be considered together with the field notes embodied in the grant for the purpose of identifying and fixing the location of the survey. Welder v. Carroll, 29 Tex. [317], 331; Cook v. Dennis, 61 Tex. 246, 248; Irvin v. Bevil, 80 Tex. [332], 338, 16 S.W. 21."

This decision seems to us to be in entire accord with the long-settled rule that where there is ambiguity in the calls of a survey, a locative call either in the original grant or in the English field notes filed by the original surveyor is not conclusive. The rule is thus clearly stated in the case of Jones v. Andrews, 72 Tex. 5, 9 S.W. 170, 173: "That while natural objects and artificial boundaries will generally prevail over course and distance, yet the former will often, from the nature of the case, be compelled to yield to the most inferior call. Everything being equal, the call for natural objects would have precedence, because most endurable, and less liable to change, and are supposed to be selected as land-marks because of their immutability. This is only true when they are selected as locative calls, and are not then always absolute. When they are noted in the field-notes as mere incidental calls in passing, their reliability is weakened, and sometimes rendered wholly worthless."

It would have been manifestly erroneous for the trial court to have instructed the jury in this case to fix the true location of the north line of the Bloodgood survey as shown by the calls for the three crossings of Cedar bayou in the English field notes filed in the Land Office by Hughes. If the locative nature of these calls is conclusive on the question of the true location of this line, such a charge should have been given. That such a charge should not have been given is forcibly illustrated by the opinion of our Supreme Court in the case of Huff v. Crawford, 89 Tex. 214, 34 S.W. 606, 610, in which the court, speaking through the late Justice Brown, says: "If upon another trial the evidence should show that the true location of any of the Scott or other surrounding surveys is material to the issue presented, then the court should not give a charge stating simply the law which defines the dignity of the different calls in a patent or other instrument,—as, for instance, natural and artificial objects, course and distance, as did the charge given in this case,—for the reason that in case of conflict be-

tween such calls this would be a charge upon the weight of the evidence. The charge upon this question should, in addition to stating the rule as laid down, also in appropriate language to apply to the particular facts of the case give the qualification of the rule 'that the true and correct location of the land is ascertained by the application of all or any of these rules to the particular case, and, when they lead to contrary results or confusion, that rule must be adopted which is most consistent with the intention of the parties apparent upon the face of the patent, read in the light of the surrounding facts and circumstances.' Stafford v. King, 30 Tex. [257], 271 [94 Am.Dec. 304]."

The same rule is stated in the case of Linney v. Wood, 66 Tex. 22, 29, 17 S.W. 244, 246, in which it is said: "There is no rule of law which makes a call for a natural object under all circumstances the controlling call, so as to preclude the consideration of other evidence as to the true locality of the land."

The marked bearing trees found on the ground being of the identical kind of trees called for in the field notes, and their course and distance from each other being identical with the calls in the grant, such trees are not artificial, but have the dignity of natural objects. Phillips v. Ayres, 45 Tex. 601, 608.

In addition to the facts set out by Justice LANE in the main opinion, against which this second motion for rehearing is directed, the evidence shows that a line run from this old marked tree corner, the course and distance called for, will reach the long established and recognized northeast corner of the Bloodgood survey, and that such line will cross Cedar bayou three times; that for the first half of the distance this line runs through timbered land, and that there are old marked trees on both sides of the line; that the line as fixed by the crossing of Cedar bayou as called for in Hughes English field notes does not run through timber, and with the exception of one old tree there is no indication that at the time the original survey was made there were any trees within one-fourth of a mile of the corner fixed by giving conclusive effect to the crossing calls of Cedar bayou in the English field notes. In addition to this, the evidence shows that if the north line of the Bloodgood is run at the course called for in the field notes as set out in the grant and in the Hughes English field notes, it will cross Cedar bayou five times, and that in order to limit the crossings to the three at which the course of the bayou is found to correspond with that given in the Hughes English field notes the course of the line must be changed from N. 80½ E. to N. 79.19 E.

Upon this state of the record it is clear to us that the case was one for the jury to decide, and that the finding of the jury is supported by the great weight and preponderance of the evidence.

The attack made in the motion on the charge of the court, on the ground that the charge was upon the weight of the evidence, cannot be considered. No such objection to the charge was made in the trial court, nor in the brief of appellant filed in this court. The only objection to the charge made on the trial or presented in appellant's brief complains of the charge on the ground that the undisputed evidence conclusively fixes the location of the north line of the Bloodgood survey as claimed by appellant, and that appellant was entitled to an instructed verdict so locating the line. Article 2185, R. S. 1925; Davenport v. Ry. Co. (Tex. Civ.App.) 72 S.W.(2d) 933–935; Waterman Lumber Co. v. Beatty, 110 Tex. 225, 218 S.W. 363; Isbell v. Lennox, 111 Tex. 522, 295 S.W. 920; Boatner v. Ins. Co. (Tex.Com.App.) 241 S.W. 136; A. L. Wolff & Co. v. Ry. Co. (Tex.Com.App.) 289 S.W. 1000.

The charge complained of in the motion for rehearing as being upon the weight of the evidence is special issue No. 1, which reads as follows: "Do you find from a preponderance of the evidence that the original northwest corner, as called for in the original league grant to William Bloodgood, and identified therein by the two witness trees, one an oak and the other an elm, both marked 'W. B.,' is located on the ground at the point claimed by the plaintiff Cockrell, and identified, 'B M I F,' on the map presented by the plaintiff's witness Faber?"

We do not think the objection to the charge should be considered when made for the first time on motion for

rehearing. If this conclusion is unsound, appellant should not be heard to complain of the charge, because if the charge gives undue prominence to the testimony of any witness in the case it is that of plaintiff's witness, Faber. .

 This charge is further objected to on the ground that it does not submit the issue in such manner as to require the jury to find the true location of the line. We think this objection to the charge comes too late. But we cannot agree with appellant that the charge is subject to the criticism made in the motion. There is no evidence which tends to show that the marked trees called for in the field notes were located elsewhere than at the point claimed by appellees.

 The appellant alleged in his petition that the location of the land claimed by him to be vacant land was primarily dependent on the location of the north line of the Bloodgood survey. The burden was upon him to show the location of the claimed vacancy, which he contended was conclusively fixed by the calls in the field notes for the crossings on Cedar bayou. When the jury found against him on this issue, the court was authorized, if not required, to render the judgment as it did in favor of the defendants, that plaintiff take nothing against any of them and that defendants recover of plaintiff their costs of suit.

Our attention is called by appellees to the statement on page 789 of our main opinion, that other witnesses (in addition to those whose testimony is set out in the opinion) "testified that the northwest corner and north line" (of the Bloodgood survey) "was generally understood by those in the vicinity to be where Faber's map shows them to be." We have examined the voluminous statement of facts, and fail to find such testimony, and withdraw this erroneous statement from our main opinion.

The other questions presented by the motion, we think, were correctly disposed of in our main opinion and need not be further discussed.

It follows from the conclusions hereinbefore expressed that the motion for rehearing should be overruled and it has been so ordered.

Overruled.